[Sac. No. 4379. In Bank.—August 31, 1931.]

WILLIAM COLLIER, Appellant, v. MERCED IRRIGATION DISTRICT (a Public Corporation), Respondent.

Treadwell, Van Fleet, Laughlin and Treadwell and Treadwell, Van Fleet & Laughlin for Appellant.

Stephen W. Downey, H. B. Seymour and Downey, Brand and Seymour for Respondent.

Samuel C. Wiel, *Amicus Curiae*.

PRESTON, J.—In this cause the pleadings tender both equitable and legal issues which have arisen out of the con-

flicting claims between plaintiff, a riparian proprietor, and the defendant, an irrigation district, which itself owns certain lands riparian to the stream in question.

The Merced River is a natural stream of this state of considerable capacity, rising in the Sierra Nevada mountains and flowing westerly through the San Joaquin Valley and Merced County in its course toward the sea. Defendant is a public corporation irrigation district, organized in 1920, and owning in said county and valley about 189,000 acres of land susceptible to irrigation and cultivation, 10,000 acres of which lie to the north and the balance to the south of said stream. The lands are productive with irrigation and comparatively unproductive without it as the natural rainfall in the valley is insufficient for profitable agricultural production. Like many other California streams, the run-off of said river varies widely during the different periods of the year and likewise varies widely from year to year. In some seasons it has been known to carry a flow of as much as 3,700 cubic feet per second; at other times it has been known to be as low as 25 cubic feet per second. The average run-off is 1,069,000 acre-feet per annum. There are, however, periods of high flow in every year, occurring between the months of April to October, inclusive. They are due in part to rainfall but more properly to the melting snows in the upper reaches of the stream in the said mountains. These periods of flood are usual and ordinary and constitute a part of the normal flow of the stream. There are in the stream no extraordinary, flood, storm or unusual freshet waters but all of the water therein is properly classified as part of the usual and normal flow thereof.

The basic facts involved in this action are not in dispute. Plaintiff owns and for many years last past has owned some 527.86 acres of land in the San Joaquin Valley, patented to his predecessors in ownership in several separate lots or parcels. The main channel of said Merced River traverses these lands. There is also a branch or slough channel which takes out of said river at the easterly end of these lands and flows entirely through them, returning to the river. All plaintiff's lands are riparian either to the main channel of the river or to said branch channel, or to both. The branch channel itself, while a natural watercourse, receives water only at comparatively high stages of the river.

Plaintiff, for an indefinite period, has made use annually of the seepage of said main and branch channels of the stream, as well as of the overflow thereof at times, in growing upon his said lands and producing therefrom various crops of alfalfa and perhaps other grasses and he has made beneficial use of the whole stream in its natural state, except such use thereof as has been subject to a preferential appropriative right owned by defendant district to divert and use on nonriparian lands, when present, the continuous flow of said stream to the extent of 1600 cubic feet per second. This water is diverted from the stream above plaintiff's lands by means of two main canals, 1500 cubic feet per second being carried in what is known as the south side canal and 100 cubic feet per second in what is known as the north side canal. The existence of this prior and preferential right is not in dispute but it is subject to the limitation that when 300 second-feet or more of water are in the stream, 225 second-feet thereof must be left undisturbed flowing down the channel thereof but when less than 300 second-feet are present, three-fourths thereof must be allowed to remain in the channel of the stream. Until this controversy arose, however, plaintiff's riparian right, subject to said right above mentioned, was intact and had all the elements and strength inherent in such a property right.

But this immediate controversy has arisen from the following additional facts: In 1919 the predecessor of defendant district lodged with the division of water rights certain applications having for their object the securing of a permit to erect upon the upper reaches of this stream, in Mariposa County at a place called Exchequer, a dam across the stream 326 feet high, creating a reservoir with a capacity of 289,000 acre-feet and to obtain the right to fill and refill this reservoir during the year to the aggregate extent of 850,000 acre-feet and to drain the water from said reservoir at the rate of 2,125 cubic feet per second and pass it through a powerhouse to be erected below said dam and, after using it for power purposes, convey it to headgates of canals then existing or thereafter to be constructed, and thereafter to divert the major part of it through said canals upon nonriparian lands for irrigation uses thereon. Said permits were issued about July 1, 1922, and thereafter recorded in the office of the county recorder of said Mariposa County, followed by

the securing of a permit to the same effect from the federal power commission.

On or about said last-mentioned date actual work on said project was begun and the same was prosecuted with diligence to completion. Prior to April 21, 1926, said dam and diversion works and said power plant were completed and during that year there was stored in said reservoir 159,152 acre-feet of water and in the year 1927 there was stored in said reservoir 296,110 acre-feet and in the year 1928, up to the time of the filing of the complaint herein, 27,038 acre-feet. Said power plant has a capacity for generating electrical energy of approximately 42,000 horsepower or 130,000,000 kilowatt-hours of electrical energy per annum. Defendant also has contracted to sell and dispose of said electrical energy to the San Joaquin Light and Power Company for a period of some twenty years, greatly to the benefit of said district. For the purchase of the original water right and for the construction of the diversion works and improvements above mentioned, defendant in 1921 voted a bond issue of $12,000,000; on March 31, 1924, voted an additional bond issue of $3,250,000 and on April 1, 1926, an additional bond issue of $1,000,000, making a total of $16,250,000. A large portion of these sums was used in the construction of said dam and power plant and in the construction and extension of canals and in the betterment of the system generally.

In anticipation of this event the owners of large areas in the district leveled their lands and prepared them for the reception of irrigation water and planted trees, vineyards and crops. It is even claimed that small towns sprang up in the district and that the population of other towns materially increased because of the anticipated operation of this project. Plaintiff not only had constructive notice but he had actual notice of these proposed improvements and of the extent of the proposed invasion of his riparian rights. He had such knowledge for more than five years prior to the commencement of this action and he never registered a protest.

Upon this state of facts, on March 7, 1928, plaintiff commenced this action. The complaint is in two counts, one containing a prayer for $100,000 for damages already suffered to plaintiff's riparian rights in the said above-mentioned

lands; the other a prayer for an injunction against threatened additional encroachment upon his said riparian rights. The theory of the complaint is that on April 21, 1926, defendant appropriated for said use plaintiff's riparian rights to the extent of taking the right to store and divert 300,000 acre-feet of water per annum but that defendant has not yet stored the full contemplated amount of 850,000 acre-feet and therefore plaintiff has the right to enjoin the annual storage of the additional 550,000-odd acre-feet of water of said stream; also that inasmuch as the limit of capacity of the diversion canals is 1600 cubic feet per second, the contemplated additional diversion of 525 cubic feet per second may properly be enjoined.

Defendant answered and set forth various and sundry defenses to plaintiff's claims, the principal one being that a public use had intervened as to the whole of its claim, to wit: The right to store, when produced by the stream, 850,000 acre-feet per annum, by filling and refilling said reservoir and by diverting the original 1600 acre-feet therefrom evidenced by the prior water right and the additional amount of 525 cubic feet per second from the water so stored, subject, of course, to the limitation above specified when there is a small amount of water only in the stream. Defendant also alleged the right to generate electrical energy by means of said power-house as above stated. It urged the above allegations as a complete defense to the injunction feature of plaintiff's complaint and also pleaded that plaintiff had suffered no damage but on the contrary had been benefited by the manipulation of the stream in the manner proposed by the reclaiming of his said lands. But in that respect it also pleaded, in the alternative, in each special defense to the action, as follows: "Defendant alleges, however, that if it has invaded any right of plaintiff that the damage, if any, suffered by the plaintiff can be readily estimated in terms of money, and defendant under such circumstances hereby offers to pay to plaintiff all lawful damages sustained, said damages to be fixed in this proceeding. Defendant further offers, stipulates and agrees under such circumstances, and as determined and fixed by the evidence and the court herein, to provide plaintiff, and to make available for his land, during the irrigation season of each year such amount of water as may be reasonably required by

plaintiff by reasonable methods of diversion, said obligation of defendant to be made a part of the judgment in this case.''

Defendant then ended with a prayer as follows: ''Wherefore, defendant prays that plaintiff take nothing by this action but that defendant have judgment herein. In the event that any right of plaintiff is found to be invaded by defendant, defendant hereby offers to pay all lawful damages and prays that the compensation therefor be fixed in this suit. Defendant further prays for such further, other and additional relief as to the court may seem proper or appropriate.''

The cause proceeded to trial. The court heard and determined the equitable issues first and held that a public use had intervened as to all claims of defendant district, specifying them, as above outlined, and for that reason held that an injunction should be denied but it confirmed the riparian right of plaintiff. At the request of plaintiff it then summoned a jury to try the legal issue of damages. On the trial of the case defendant was allowed to meet this issue by a stipulation which should be and become a condition precedent to the exercise of any additional rights in the stream and should become part of the judgment in the case, which said stipulation, so far as here material, is as follows:

''That Merced Irrigation District shall never impound in the Exchequer Reservoir and/or divert from the Merced River by means of its canals or other diversion works, or otherwise, any of the waters of the Merced River until and unless, and only so long as, there is flowing in said main channel of the Merced River at and along the riparian lands of Plaintiff William Collier, described in the amended complaint, and at and along the whole thereof, and at and along every part thereof, water to the extent and quantity of eighteen (18) cubic feet per second, which water and all of said water shall be available for diversion by plaintiff and shall be suitable for irrigation of said lands of plaintiff described in the amended complaint, and all parts and portions thereof, without diminution by other riparian proprietors or by appropriators or by diversioners of any kind, or character or in any respect whatsoever.''

The jury were instructed to give full credence to the weight and extent of this stipulation and to base their ver-

dict upon its existence, enforceability and inviolability. Expert and lay witnesses were heard by both sides and the jury returned a verdict in favor of the defendant. Judgment passed accordingly; plaintiff was denied his costs of suit. He promptly appealed. On this appeal he urges the questions which will now be discussed.

The first contention is that the court erred in holding. that a public use had intervened as to the whole of said project. Appellant's contention in this respect is that, as above outlined, respondent not having in any one season stored 850,000 acre-feet of water of said stream, but at most only 296,110, a public use had not intervened as to the full 850,000 acre-feet and, moreover, inasmuch as defendant had not yet constructed canals sufficient to carry 2,125 second-feet of water, its right to divert any amount in excess of 1600 second-feet had not yet attached.

We think this is entirely too narrow a view to take of the situation. As above pointed out, with full actual knowledge for a period of five years or more of the specific intention of respondent, as disclosed by the several state and national permits, and with knowledge of the effect the works might have upon the stream and consequently upon his riparian right, appellant permitted an outlay, at great cost, for the construction of this dam, power-house and diversion works, without protest, and it is not unreasonable to hold that respondent thereby put itself in charge of a public use, as to all that portion of the stream covered by its expressed and known intention within the capacity of the reservoir. The closing of the stream by the dam under these circumstances should allow the use of the reservoir to its capacity during any one season up to the limit of respondent's permits. It utilized during the years 1926–28 practically the whole yield of the stream and it is but a fair construction of the effect of its action to say that it secured the right to take all the yield up to its claim of 850,000 acre-feet, and that appellant, by his inaction, waived his right to equitable relief.

"It is perfectly true that not even a corporation possessing the power of eminent domain may under the constitution (art. I, sec. 14) take or damage private property without first making adequate compensation. But this right may be waived by the owner and in order to prevent the obstruction of progress he must be held to diligence in asserting

his right as against a concern administering such a public use. If he allows his property right to be invaded and either taken or damaged for a public use and the public right has so far intervened as to justify the belief that objection has been waived, then in law the property right so taken or damaged is to that extent dedicated to the public use.'' (*Conaway* v. *Yolo Water & Power Co.*, 204 Cal. 125, 131 [58 A. L. R. 674, 266 Pac. 944, 946].)

█ If this right to store is conceded, the ability to divert in any certain quantity would seem to be largely a false factor, for if the appellant is not allowed to object to the amount of storage, he may not be allowed to object to the manner of diversion thereafter unless a special injury results to him thereby. The injunction in the Herminghaus case (*Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607]) was not against existing reservoirs nor against the filling and refilling of them during a season but was against the future use of water in an unfinished and unused set of reservoirs existing in mere contemplation. Neither is the case of *Turner* v. *East Side Canal Co.*, 169 Cal. 652, 657 [147 Pac. 579], controlling here. It was there held that where a utility had taken extra water into its canal and had allowed it to go to waste, no public use had intervened. But here a dam which closed the entire stream was erected and the total yield of the stream to the capacity of the reservoirs was devoted to public use, and this would seem to distinguish it from either of the above-cited cases.

█ Besides, it fairly appears on the face of the complaint that appellant was guilty of laches. (*Conaway* v. *Yolo Water Co., supra.*) And laches abundantly appears from the evidence and facts found by the court. Inasmuch as appellant was put on notice of all the essential features of such a plea by the allegations of the intervention of a public use and the statute of limitations, it does not seem to be a harsh act to invoke the doctrine here for the first time to sustain the action of the court below. (*Garrity* v. *Miller*, 204 Cal. 454 [268 Pac. 622]; *Stevinson* v. *San Joaquin etc. Co.*, 162 Cal. 141 [121 Pac. 398]; *Akley* v. *Bassett*, 189 Cal. 625, 648 [209 Pac. 576]; *Scott* v. *Symons*, 191 Cal. 441, 457 [216 Pac. 604].) We therefore fully approve of the ruling of the court in this respect.

■ Appellant next claims that the pleadings of respondent are an attempt to invoke the special procedure outlined in section 534 of the Code of Civil Procedure and urges that this may not be done as the section is unconstitutional and void. The contention here is that inasmuch as private property may not under the Constitution be taken or damaged without compensation being first fixed and paid, a property owner may not be denied an injunction to prevent a violation of this guaranty and that such is allowed by the section. This and other questions raised we regard as serious but in view of the fact that the property has already in effect been taken, the question of the validity of said section does not arise. For we think the proceeding here involved is allowable upon settled principles of equity. This cause is in effect the reverse of a condemnation proceeding— a proceeding to fix damages after the taking and not before the taking of the property as enjoined by the Constitution. As early as *City of Los Angeles* v. *Pomeroy*, 124 Cal. 597 [57 Pac. 585], it was settled in this state that in a proceeding in eminent domain, the conflicting claims to the rights of the condemning party in the property could be determined as well as the conflicting rights of the parties defendant thereto. There was, therefore, no objection to respondent here, who has the right to invoke the power of eminent domain, tendering the issue by answer or cross-complaint of its own claims to the property and after these were settled to allow the action to be tried as if in an eminent domain proceeding. The answer of respondent contained every element of a cross-complaint in such an action. It was treated as sufficient to raise this issue and that is all that is required. (*Turner* v. *East Side Canal Co., supra.*) We regard the case as also being similar to the situation in *Newport* v. *Temescal Water Co.*, 149 Cal. 531, 538, 539 [6 L. R. A. (N. S.) 1098, 87 Pac. 372, 375], and the following language from that authority seems appropriate: ''And, finally, upon this proposition it may be said that where the interests of the public are involved and the court can arrive in terms of money at the loss which plaintiff has sustained, an absolute injunction should not be granted; but an injunction conditional merely upon the failure of the defendant to make good the damage which results from its work. Such an action, if successful, should be regarded in its nature as the reverse of an action

in condemnation. The defendant in effect would be held to be damaging private property without just compensation first made to the owner, and, failing to make such compensation, should be enjoined from further damage.''

This holding is but an application of the well-known equity rule which Mr. Pomeroy states as follows (1 Pomeroy's Equity, 4th ed., sec. 242): ''It was a fundamental conception of the equity jurisprudence, from the earliest periods as soon as its jurisdiction had become established . . . to determine the entire controversy, to award full and final relief . . . and thus to bring all possible litigation over the subject matter within the compass of one judicial determination.''

· Appellant at this juncture urges that respondent took his property for a public use on April 21, 1926, and his damages are the difference between its market value with and without this property right. From this premise he urges serious and far-reaching error arising from the so-called stipulation above quoted respecting a so-called guaranty of the presence continuously at his land of 18 cubic feet per second of water available for his sole use and benefit. The argument is that to allow the jury, in measuring his damages, to predicate its action upon the existence and inviolability of said guaranty was to pay his damages in property or ''chips and whetstones'' and not in money as the law demands.

It is, of course, not open to question that damages for a tort may not be satisfied by the enforced acceptance of property or any other thing than money. In other words, the law does not countenance the payment of damages by a substitution of their equivalent in property or in valuable privileges. But does this properly characterize the issue here?

The riparian right is a usufructuary one in the stream, a part and parcel of the land itself. Any injury short of a complete divestiture of the right leaves a *quantum* in kind in the proprietor thereof. If the intruder relinquished a part of the right to the channel of the stream to that extent he restored the right to its rightful owner. We have here then a partial taking, with a relinquishment to the stream of a portion of the right seized. We have seen above that under the ruling of·the court the action became in effect a cross-action to determine damages as if in eminent domain

proceedings. Appellant concedes that in eminent domain proceedings a stipulation of this character would be proper and in this connection it may be profitable to cite from a few of the mass of cases from outside jurisdictions on this question.

In the case of *Tyler* v. *Hudson*, 147 Mass. 609 [18 N. E. 582, 583], a leading case, the following language is found: "The right to take the land by purchase or otherwise does not involve the obligation to take the whole interest in land purchased or otherwise taken. That a right of way could be reserved in land taken by purchase will not be questioned; the objection to reserving a right in the owner in land taken *in invitum* is technical rather than substantial. It is true that, in a sense, it may be said to create a new estate in him without his assent. A technical answer might be, that, the estate being for his benefit, his consent and acceptance simultaneous with the taking will be presumed. The real answer is that the refinements and nomenclature of conveyancing will not be applied to a taking by right of eminent domain. No more land and no greater interest in it need be taken than the public use requires. If the right to make a particular use of the land is of benefit to the owner, and puts no new burden upon him, and does not interfere with the public use for which the land is taken, there is no reason that he should be deprived of that use, and be paid its value as damages; all the right to use the land except that right may be taken, and that be left in him to enjoy or not as he pleases."

The above holding was followed with express approval in the case of *St. Louis etc. Co.* v. *Clark*, 121 Mo. 169, 195 [26 L. R. A. 751, 752, 25 S. W. 192, 906, 907], wherein commissioners appointed for the purpose made a report allowing the property owner $87,510 as damages. The railway company paid the award, entered into possession and then a jury trial followed and they assessed the damages at $72,000. No crossings were contemplated at the time of the award by the commissioners, but on the trial later and after possession had been taken, crossings in lieu of money compensation were tendered and it was there objected, as here, that as the property had already been taken, it was too late to make a relinquishment of any estate therein. The court quoted from and approved the case of *Tyler* v. *Hudson, supra,* and said: "No

good reason can be seen why the condemning company should not have the right to announce, upon the trial, and have made a matter of record, if not done in its petition, the manner in which the right of way should be used; otherwise, the jury would have the right to make the award on the basis of the most injurious use to which the easement could be lawfully applied in the construction and operation of the road.''

And again, in disposing of the same argument made here, the court said: ''We do not think that defendants observe the distinction between the appropriation of the land itself and the plans and methods that may be adopted for the construction, maintenance, and operation of the road thereon. We think it true, as claimed, that the appropriation of the land is complete when the amount of damage awarded by the commissioners is paid and possession is taken. . . . Upon an assessment by a jury, in case the road has already been constructed, it seems too plain to require more than a statement of the proposition that the damages should be ascertained in view of the condition in which the unappropriated land is left by the use actually made of the easement. This in no sense constitutes a payment of damages in privileges, but is simply a reduction or increase, as the case may be, of the damages on account of the manner of constructing the road.''

The case of *Spokane Valley Land etc. Co.* v. *Jones*, 53 Wash. 37 [101 Pac. 515, 517], seems much in point. There a riparian owner claimed that its right had been invaded by the construction of a dam and diversion of the waters of a lake. It brought suit after the dam was built and secured an injunction which was stayed for thirty days to allow the filing of a condemnation proceeding which was done. On the trial the company offered a similar stipulation conceding the owner certain privileges and rights in the lake similar to those tendered appellant here. The owner objected on several grounds, among which was the claim that ''The offer is an effort to reduce the damages by tendering to respondents something in lieu of money, in contravention of article 1, sec. 16, of the Constitution.'' The court then said: ''We next come to the principal question, whether the effect of this offer is to give the respondents some right or easement as compensation rather than money, in contravention of article

1, sec. 16, of the Constitution. Is it not rather an effort on the part of the appellant to appropriate a part of the water of Liberty Lake, reserving to the respondents so much thereof as shall be found necessary for the irrigation of their land, such quantity to be made definite by the court after hearing the evidence?'' This case reviews the authorities to a great extent.

A later and similar case was *Olympia L. etc. Co.* v. *Harris,* 58 Wash. 410 [108 Pac. 940], wherein a like holding was made.

The cases cited by appellant are in the main distinguishable from the above principles. Although appellant insists that the situation is that of a taking of property and a recompense in other property, to this we cannot subscribe for the reasons above set forth.

Still not satisfied, appellant further urges that respondent in this situation is paying him with water under such guaranties that it is not riparian water but privately owned water that may be from some other stream. We think a fair construction of the stipulation is that the waters shall be a part of the natural flow of the stream. It is true that the stipulation contains guaranties that savor of a priority right as distinguished from a riparian right but the ability of respondent to respond to its guaranties seems not to be doubted. A right of priority is a constant quantity and is superior in efficacy to a riparian right in the same quantity of water. But it is still water of the stream and it still washes the appellant's lands and, while more stable, it is at the same time a kindred right and a part and parcel of the same land. We think it is carrying the refinements of logic too far to sustain this contention of appellant.

The same observation is applicable to appellant's further claim that being in possession of a greater right, he may not release or cede away any of this right without setting up a substitution of one piece of property in payment of damages done to another.

The further contention that the damages should be allowed as of April 21, 1926, is disposed of by the above discussion.

The next major attack of appellant is upon the instructions of the court to the jury respecting special benefits. It is complained that the court fell into error in giving an instruction upon this subject as follows: ''In determining

the compensation, if any, to be awarded plaintiff, William Collier, in this action you are entitled to take into consideration any special benefits accruing or to accrue to plaintiff's lands by reason of the regulation of the stream flow of the Merced River by the construction and operation by the Merced Irrigation District of its Exchequer Dam and having determined those special benefits to consider and apply the same in reduction of the amount of compensation which you might otherwise award plaintiff in this proceeding. Special benefits are such as are peculiar to the land of plaintiff and result from the mere construction of the dam. They are to be distinguished from general benefits, the latter being enjoyed by the public at large as the result of the construction of the improvement. General benefits, accordingly, are not to be considered by you in your deliberations. But special benefits *may* be so considered and accordingly you may take into consideration benefit if any to the Collier land which is direct and special as to that land and not enjoyed in common with the public at large.''

The language of article I, section 14, of the Constitution, in this behalf is: ''Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner, and no right of way shall be appropriated to the use of any corporation, except a municipal corporation or a county, until full compensation therefor be first made in money or ascertained and paid into court for the owner, irrespective of any benefits from any improvement proposed by such corporation. . . . ''

Section 1248, subdivision 4, of the Code of Civil Procedure, provides in this connection as follows: ''4. If the property sought to be condemned be water or the use of water, belonging to riparian owners, or appurtenant to any lands, how much the lands of the riparian owner, or the lands to which the property sought to be condemned is appurtenant, will be benefited, if at all, by a diversion of water from its natural course, by the construction and maintenance, by the person or corporation in whose favor for the right of eminent domain is exercised, of works for the distribution and convenient delivery of water upon said lands; and such benefit, if any, shall be deducted from any damages awarded the owner of such property.''

This provision of the statute was followed by the court. Under the constitutional provision it would seem at most that special benefits were to be excluded in right of way cases except those involving a municipal corporation or county. In other words, except in favor of municipal corporations and counties in right of way proceedings, benefits are to be excluded but there is no inhibition respecting special benefits in any other kinds of taking under the Eminent Domain Law. This interpretation was practically conceded in *Yolo Water etc. Co.* v. *Hudson*, 182 Cal. 48 [186 Pac. 772]. The following from *Hicks* v. *Drew*, 117 Cal. 305, 314, 315 [40 Pac. 189, 192], seems to be in point: "The jury was instructed as follows: 'If the jury find from the evidence that the plaintiff has sustained any damage by the act of defendant, as she has complained against him, and that by the same act she has received benefit, then, in estimating such damage, such benefit should be deducted.' This instruction was correct." (See, also, *Eachus* v. *Los Angeles etc. Co.*, 103 Cal. 614 [42 Am. St. Rep. 149, 37 Pac. 750]; *Beveridge* v. *Lewis*, 137 Cal. 619 [92 Am. St. Rep. 188, 59 L. R. A. 581, 67 Pac. 1040, 70 Pac. 1083].)

Moreover, the question of benefits seems to be an immaterial factor in the class of cases to which this one belongs. Respondent was permitted to prove that the storage above appellant's lands would practically prevent overflows on said lands and would have a tendency to reclaim them and make them useful for ordinary cultivation; also that in the operation of the power plant about one-half the water would be restored to the stream; also to show the measurement of the stream at appellant's lands during the operation of the dam; also that seepage from the canals into the stream was unavoidable. The court, however, expressly instructed the jury to disregard seepage waters as an element of benefit. It will be noticed that each item of evidence throws light upon the extent of the taking by respondent. Besides, while the riparian right is a part and parcel of the land in a legal sense, yet it is a usufructuary and intangible right inhering therein and neither a partial nor a complete taking produces a disfigurement of the physical property. The only way to measure the injury done by an invasion of this right is to ascertain the depreciation in market value of the physical property. But the only way to show that depreciation is

to show the consequences to the land from the construction and operation of the public works. Therefore, in a case of this type, it is impossible to separate or disregard the item of benefits in making up a verdict or judgment. Were it a case where the property taken had a physical independent existence and an independent value and was a part of a larger area, it would then be possible to disregard the item of benefits when appraising the specific property appropriated (sec. 1248, Code Civ. Proc., subd. 2). There was no error in the instructions or rulings with respect to the item of benefits. There was a distinct conflict in the evidence as to whether the lands of appellant had a greater or a less market value after the taking by respondent, but there is no question of law arising on the evidence.

This cause, ably handled by counsel on both sides, represents a contest between opposing schools of thought. We cannot refrain also from commending the trial judge for his very efficient handling of the difficult issues presented to him.

There is, in our opinion, no need of further discussion except as to the item of costs in the court below and in this court. The cause having been converted practically into a condemnation proceeding and appellant having been paid in "benefits", the constitutional provision above quoted seems to be sufficient to vouchsafe the award to him free from the costs of respondent and with his own costs as well. (*San Joaquin etc. Co.* v. *Stevinson,* 165 Cal. 540 [132 Pac. 1021].)

Accordingly, the judgment is modified so as to allow appellant his costs in the court below and on appeal. As so modified, said judgment is affirmed.

Curtis, J., Richards, J., Seawell, J., Waste, C. J., and Shenk, J., concurred.

Rehearing denied.