[No. B042936. Second Dist., Div. Seven. May 16, 1991.]

DAVID MORGAN et al., Plaintiffs and Appellants, v.
COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS
ANGELES et al., Defendants and Respondents.

SUSAN B. NELSON et al., Plaintiffs and Appellants, v.
COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS
ANGELES et al., Defendants and Respondents.

**COUNSEL**

David Morgan, in pro. per., Gronemeier & Barker, Elbie J. Hickambottom, Jr., and Dale L. Gronemeier for Plaintiffs and Appellants.

James K. Hahn, City Attorney, Patricia V. Tubert, Susan D. Pfann, Kane, Ballmer & Berkman, R. Bruce Tepper, Jr., and Kathryn Reimann for Defendants and Respondents.

## OPINION

### KALIN, J.*—

#### INTRODUCTION

The Hollywood Redevelopment Project (the Project) was adopted by the Los Angeles City Council on May 7, 1986, and signed by the mayor on May 9, 1986. It establishes a project area of approximately 1,100 acres in that part of the city known as Hollywood. The primary goals of the Project are the elimination of blight and revitalization of the area. The Project would divert tax increment funds to the community redevelopment agency (CRA or agency) during its lifetime of 30 years.

The area encompassed is an older portion of Hollywood generally bounded by LaBrea Avenue on the west; Franklin Avenue, the Hollywood Freeway and Hollywood Boulevard on the north; Serrano Avenue on the east; and Fountain Avenue and Santa Monica Boulevard on the south.

Included in the area are residential, commercial and industrial development constituting 796 net acres (exclusive of streets, freeways and other right of way) which are subdivided into 2,908 separate parcels of land with 2,033 separate owners.

The CRA commenced setting up a project area committee (hereafter sometimes PAC) in 1983. Elections to the PAC were conducted on December 13, 1983, and joint public hearings on the Project were held on April 16, 1986. The proceedings leading up to the adoption of the redevelopment plan (hereafter sometimes the Plan) was a process of Plan review which required two and one-half years, resulted in one hundred twenty community meetings, three days of public hearings and review by the city planning commission and the Los Angeles City Council. The PAC approved the adoption of the redevelopment plan. The Los Angeles City Council adopted the Plan by a two-thirds majority vote.

Plaintiff/appellant Norton Halper filed a validation action in the Superior Court of Los Angeles County which was consolidated with a similar action filed by parties identified as SHOT (Save Hollywood Our Town). Judgment was entered in favor of defendants/respondents the CRA and the City of Los Angeles on April 20, 1989, and a timely notice of appeal was filed.

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

## ISSUES

Appellants have raised the following issues on appeal.

1. The PAC did not meet the statutory requirements of self-formation and representativeness.

2. The project area residents' and property owners' due process rights were violated by inadequate notice of the PAC formation and the joint public hearing.

3. The CRA and the Los Angeles City Council were erroneous in their determination that the project area is blighted and that the determination is not supported by substantial evidence.

4. Appellants were improperly denied discovery by the trial court.

5. The trial court applied the improper standard of review in granting judgment upholding the validity of the Project as approved and adopted by the Los Angeles City Council.

6. The trial court erroneously found that there was no credible evidence of appellants' allegations of fraud by the CRA and the City of Los Angeles in the formation and adoption of the Plan.

7. The redevelopment is not consistent with the City of Los Angeles General Plan.

8. The trial court erred in awarding costs to respondents and against appellants Susan B. Nelson, Karen Hale Wookey, Jamie Riehl and Katherine Armour.

## DISCUSSION

*The PAC Was Self-formed as Required by Law and Was Representative Within the Meaning of Health and Safety Code Section 33385.*

The Legislature has made provisions for the formation of a project area committee in section 33385 of the California Health and Safety Code:

"The legislative body of a city or county shall call upon the residents and existing community organizations in a redevelopment project area, within which a substantial number of low- and moderate-income families are to be

displaced by the redevelopment project, to form a project area committee. The project area committee shall include, when applicable, residential owner occupants, residential tenants, businessmen, and members of existing organizations within the project area. The members of the committee shall serve without compensation.

"The legislative body shall approve a representative project area committee in each project area within 60 days after the project area is selected."

█ The trial court made the following findings regarding the formation of the PAC which are consistent with the record and supported by substantial evidence. The city adopted a resolution calling for the formation of a PAC to include property owners, residential tenants, business owners, and existing community organizations. Four community organizations were to be appointed to the PAC by the council office; the remaining twenty-one members were to be elected by the community within the proposed project area.

The CRA sent two separate mailings of a notice of formation of the project area committee to the property owners of record in the proposed area and in addition distributed approximately twenty-five thousand circulars throughout the project area on two occasions in August and November of 1983. Notices were published in community newspapers by the agency and other publicity was generated by newspaper articles.

Six community meetings were held from June to November 1983 at which redevelopment and the formation of the PAC was discussed. An election was held in the Hollywood High School Auditorium on December 13, 1983, to form the PAC. Over 250 community members attended, and a secret ballot was conducted. Nominations were accepted by a procedure prior to the meeting and from the floor, all nominees were given an opportunity to speak. The trial court found that the election of the PAC members was reasonably and regularly conducted.

The election resulted in a PAC consisting of four residential property owners, four residential tenants, six business owners or tenants, three industrial or manufacturing property owners or operators, and four community organizations. Four additional community organizations were appointed to the PAC by the city council office. Within 60 days of the selection of the project area, the city council approved as representative the PAC.

Health and Safety Code section 33385 as in effect in 1983 did not specify the method of the selection of the PAC members; nor does the law provide for or require selection by the process of an election, and appointment of

members is not precluded. The legislative body has broad discretion in the formation of the project area committee. The PAC as formed had 21 elected members and 4 appointed members.

Substantial evidence supports the determination that the PAC was self-formed and representative of the project area. The methods used in the formation of the PAC were consistent with Health and Safety Code section 33385 and independently reasonable.

There was no credible evidence that the PAC was unduly influenced or dominated by any group or agency in either its formation or functioning. Pursuant to Health and Safety Code section 33386 the redevelopment agency is to consult with and obtain the advice of the PAC. This was accomplished and the PAC approved the adoption of the redevelopment plan which was then adopted by the Los Angeles City Council by a two-thirds majority.

*The Agency Complied With the Law in Providing Adequate Notice of the PAC Formation and the Joint Public Hearing.*

Health and Safety Code section 33385 as it existed in 1983 did not describe the nature of notice to be given to residents of the project area and community organizations: "The legislative body of a city or county shall call upon the residents and existing community organizations," regarding the formation of a project area committee. ■ As will be subsequently discussed, no statute specifies the manner of notice of the joint public hearing on the redevelopment plan. In the absence of statutory provision the notice should be such as to reasonably give notice to those within the project area.

During the formation of the PAC the agency made two mailings to the property owners in the project area, on two occasions distributed approximately twenty-five thousand flyers, published notice three times in newspapers and conducted six pre-PAC formation community meetings. There is a lack of credible evidence that any other form of notice would have been more effective or that any persons were denied participation in the PAC formation.

The joint public hearing is a public hearing concerning the enactment of the redevelopment plan. Notice of the hearing is provided for in Health and Safety Code section 33349: "The agency shall publish notice of the hearing not less than once a week for four successive weeks prior to the hearing. The notice shall be published in a newspaper of general circulation, printed and published in the community, or if there is none, in a newspaper selected by the agency. The notice of hearing shall include a legal description of the

boundaries of the area or areas designated in the proposed redevelopment plan and a general statement of the scope and objectives of the plan. Copies of the notices shall be mailed to the last known assessee of each parcel of land in the area designated in the redevelopment plan, at his last known address as shown on the last equalized assessment roll of the county; or where a city assesses, levies, and collects its own taxes, as shown on the last equalized assessment roll of the city; or to the owner of each parcel of land within such boundaries as such ownership is shown on the records of the county recorded 30 days prior to the date the notice is published. Copies of the notices shall also be mailed to the governing body of each of the taxing agencies which levies taxes upon any property in the project area designated in the proposed redevelopment plan. The notice shall be mailed by certified mail with return receipt requested."

Pursuant to the code requirements the agency sent notice by certified mail to the owners of property within the proposed project area as established by lists provided by the County of Los Angeles in January 1986. Additionally the agency sent notice to all persons requesting notice who appeared on the Project's mailing list, whether or not such person owned property within the proposed project area. Although not required by the code, the agency on April 4, 1986, caused to be distributed approximately 21,600 notices to residences and businesses throughout the project area. Although Health and Safety Code section 33349 requires publication of the notice in one newspaper, the agency published notice in two newspapers of general circulation distributed within the project area. The record also indicates that prior to and during the hearing process there was significant media coverage of the redevelopment plan and process.

Apparently, appellants urge that the agency was required to send notices of the joint public hearing to each assessee on the 1985-1986 county tax assessment roll, which would include all joint owners of the parcel of property, including spouses and children of joint owners, and further, if an assessee owned more than one parcel, that the agency would be required to send him or her a notice for each parcel within the project area. The evidence indicates that numerous persons owned more than one parcel of property, several owning more than ten parcels each. Approximately 500 assessees own at least 2 parcels each in the project area. There are 2,023 property owners for 2,908 parcels of real property.

Health and Safety Code section 33349 provides that notice be sent to "the last known assessee" of each parcel of land. If an assessee owns more than one parcel of land a single notice is sufficient under the statute. Likewise the statute does not require a notice to be sent to each joint owner of the parcel of property.

In the case of *Herrington* v. *Weigel* (1978) 82 Cal.App.3d 676, 682-683 [147 Cal.Rptr. 396], the court held that a directive to send notice to assessees does not require that each assessee receive a separate notice. A co-tenant's due process rights were not violated because separate notices of an "Intent to Deed Property to the State" for failure to pay back taxes were not sent. In that case section 3701 of the Revenue and Taxation Code provided ". . . the tax collector shall send a notice by registered mail of the intended sale to the last *assessee* of each portion of the property at his last known address." The court held that "there is no requirement in the code that 'each' assessee be sent a separate copy or copies. The assessees have some duty to designate how they want their names to appear on the tax rolls." In *Herrington* the cotenant could lose his interest in the real property by forfeiture if not notified by the co-owner assessee who received notice, a harsh result. The instant case would not result in such a drastic action but rather involves the designation of the property as a parcel within the redevelopment plan.

Although it is reasonable to conclude from the record that some assessees may have not received a notice by certified mail of the joint public hearing, the number is disputed by the parties and substantial evidence supports the conclusion that the agency made a good faith effort to satisfy the code requirements of notice to those property owners within the project area. Any defects were technical and not substantial. There is substantial evidence that the agency attempted to inform the public and property owners in the project area as to the various steps and meetings in the process of the adoption of the redevelopment plan; there is no credible evidence that the agency pursued a policy of suppressing or failing to make available notices and information regarding the Project. The meetings were well publicized and well attended.

In *Downtown Palo Alto Com. for Fair Assessment* v. *City Council* (1986) 180 Cal. App.3d 384, 389, 390 [225 Cal.Rptr. 559], Streets and Highway Code, section 36522, required the notice of the adoption of an assessment district be mailed to "each business in the proposed, or established area." The facts indicated that about 25 percent of the businesses did not receive notice, 179 of 727. The appeals court affirmed the trial court's holding that the city had substantially complied with the statute. The court held at pages 394-396:

"Literal compliance with the statute would also be unreasonably burdensome to cities seeking to establish improvement areas. . . . And if we were to demand strict compliance with the statute, failure to send the requisite notice to a single business in the proposed improvement area could result in

the invalidity of the entire procedure. Nothing in the statutory scheme suggests that the Legislature intended such a harsh result. . . .

"The requisite notice must promote and satisfy the objectives of the law; but if it does so, mere technical, insubstantial noncompliance with the provision . . . that notice of the hearing must be sent to 'each business' in the proposed improvement area will not invalidate the proceedings."

The appellants each received notice of the joint public hearing and no claim of lack of notice was made at the joint public hearing. Appellants have failed to show that a substantial number of persons failed to receive notice or that any owners of property sustained prejudice by lack of notice. Any error, irregularity or omission by the agency did not affect the parties' substantial rights. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 43, 44 [37 Cal.Rptr. 74, 389 P.2d 538].)

*The Determination by the CRA and the City of Los Angeles That the Project Area Is Blighted Is Supported by Substantial Evidence.*

The statutory provisions applicable in order to make a determination of blight are as follows:

Health and Safety Code section 33030: "It is found and declared that there exist in many communities blighted areas which constitute either physical, social, or economic liabilities, requiring redevelopment in the interest of the health, safety, and general welfare of the people of such communities and of the state.

"A blighted area is one which is characterized by one or more of those conditions set forth in Sections 33031 or 33032, causing a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical, social, or economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise acting alone."

Health and Safety Code section 33031: "A blighted area is characterized by the existence of buildings and structures, used or intended to be used for living, commercial, industrial, or other purposes, or any combination of such uses, which are unfit or unsafe to occupy for such purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of any one or a combination of the following factors:

"(a) Defective design and character of physical construction.

"(b) Faulty interior arrangement and exterior spacing.

"(c) High density of population and overcrowding.

"(d) Inadequate provision for ventilation, light, sanitation, open spaces, and recreation facilities.

"(e) Age, obsolescence, deterioration, dilapidation, mixed character, or shifting of uses."

Blight is also found where properties suffer from economic dislocation, deterioration or disuse because of one or more of the following factors:

Health and Safety Code section 33032: . . . "(a) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development.

"(b) The laying out of lots in disregard of the contours and other topography or physical characteristics of the ground and surrounding conditions.

"(c) The existence of inadequate public improvements, public facilities, open spaces, and utilities which cannot be remedied by private or governmental action without redevelopment.

"(d) A prevalence of depreciated values, impaired investments, and social and economic maladjustment."

■ The Los Angeles City Council in adopting the redevelopment plan had before it the agency's report to the council consisting of 640 pages which included 219 pages describing conditions in the project area.

The community of Hollywood was originally a low-density residential area which now consists of old and deteriorating buildings, seriously overcrowded housing conditions and a substantial number of seismatically unsafe commercial buildings. There is a lack of adequate housing, open space and transportation. Twenty-five percent of the commercial structures suffer construction defects in that they were built with unreinforced masonry.

The population of the project area increased 25 percent from 1970 to 1980; however, during the same period available housing only increased 2 percent. In 1980 approximately 5,000 households had 3 or more occupants but only 2,000 housing units had 2 or more bedrooms. Areas originally designed and built as low-density residential have been transformed into

high-density multifamily dwellings. The project area is deficient in park land.

The buildings are old and show deterioration. At least 36 percent of the single-family residences show deferred maintenance; an additional 27 percent require moderate to heavy rehabilitation. There is adult entertainment in close proximity to schools and residences. There are incompatible industrial uses in the area.

Hotels and motels have shifted to use as transient rentals and regional retail uses have shifted to transient specialty shops.

The project area is poorly subdivided making proper development difficult because of land ownership patterns. Land values have depreciated. There is a need for housing due to overcrowding, but 86 percent of the residential parcels are below the threshold size for development. Over 20 percent of the land parcels fail to meet minimum zoning standards. Ninety-two percent of the residential property is separately owned, but only six percent of the housing is owner-occupied.

New development and reinvestment in the area is unlikely due to the low-income of residents and their inability to support higher rents. The project area does not have the ability to support the present level of government services.

The reported crime rate for the project area is double the citywide rate. The street scene is dominated by youthful runaways and the homeless. Private revitalization of the area is highly unlikely.

The agency and the city council heard testimony and evidence for and against the adoption of the redevelopment plan. The city council adopted the Plan and made a determination that the project area was blighted. The trial court, in addition to reviewing the record before it from the agency and the city council hearings, permitted appellants to present contradictory evidence to the record of proceedings. The court heard 60 half-days of testimony and reviewed documents presented by the appellants. After review of all the records and the additional testimony the trial court found the decisions and determinations of respondents in adopting the Plan, including the determination that the project area was blighted, was supported by substantial evidence.

In the case of (*In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, the California Supreme Court was faced with a factual situation very similar to the case at hand. The Plan for Bunker Hill was a massive

redevelopment within the central city area of the City of Los Angeles. The respondents objected to the final plan, the determination of blight and the standard of judicial review. The Supreme Court upheld the final redevelopment plan and the determination of blight. "[I]t becomes immaterial whether the actions of the agency and the city council in adoption of the Bunker Hill project be termed 'legislative' [citation] or 'administrative' in either event the trial court was correct in its refusal to reweigh the evidence and in confining itself to determining whether the findings and determinations of the inferior bodies were supported by substantial evidence." (*Id.* at p. 40.) "The trial court was correct in its refusal to exercise its independent judgment on the evidence upon which the agency and the city council acted." (*Id.* at p. 41.) "Moreover, objectors are being accorded a judicial determination on the issue of blight through the substantial evidence review made in the subject proceeding by the trial court, and which is now before us on appeal." (*Ibid.*)

The Supreme Court in the *Bunker Hill* case, *supra*, 61 Cal.2d on page 40, in defining the scope of judicial review, cited the matter of *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833, 835 [27 Cal.Rptr. 19, 377 P.2d 83]: "As to the quasi-legislative acts of administrative agencies, 'judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support.' " "The substitution of the judgment of a court for that of the administrator in quasi-legislative matters would effectuate neither the legislative mandate nor sound public policy."

In the matter of *Fosselman's, Inc.* v. *City of Alhambra* (1986) 178 Cal.App.3d 806, 811-812 [224 Cal.Rptr. 361], the appellant challenged the redevelopment plan adopted by the city and the finding of blight. The court held "In Community Redevelopment Law the Legislature delegated to the agency and the city council the power to determine blight as well as the power to adopt and implement redevelopment plans [citations]; the acts of the agency and the city council in carrying out such functions have been termed 'legislative.' " (*Id.* at p. 811.) "The substantial evidence standard, not the independent exercise of the court's judgment, governs judicial review of the findings and determinations of an agency and legislative body in the adoption and approval of a redevelopment plan." (*Id.* at p. 810.)

The agency, the city council and the trial court found substantial evidence of blight within the project area. This court finds that there is substantial evidence to sustain the determination by these bodies of blight, and the actions by the agency and council were neither arbitrary, capricious nor entirely lacking in evidentiary support.

Differences of opinion, no matter how strongly presented, do not warrant rejection of respondent's action, where it has been demonstrated that respondents were presented with opposing viewpoints, considered them extensively and on the basis of evidence selected one alternative rather than another. (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 803 [161 Cal.Rptr. 260].)

*The Trial Court Did Not Err in Limiting Discovery.*

■ The scope of judicial review of a legislative type activity is limited to an examination of the record before the authorized decision makers to test for sufficiency with legal requirements. (*Fosselman's, Inc.* v. *City of Alhambra, supra,* 178 Cal.App.3d 806, 811-812.) ■ A substantial evidence review is limited to the record before the CRA and the city council; it is an examination of the proceedings before the entities to determine if their actions were arbitrary, capricious, or entirely lacking in evidentiary support. The trial court reviews the decision-making process of the administrative agency and does not conduct its own evidentiary hearing; thus discovery is limited.

California Community Redevelopment Law (Health & Saf. Code, § 33000 et seq., §§ 33360-33364) sets forth detailed provisions to challenge the adoption of a Plan, and it established an administrative procedure to challenge the Plan's adoption. Notices are given and public hearings are held, objectors are given an opportunity to participate in the statutory hearing process. (*Redevelopment Agency* v. *Superior Court* (1991) 228 Cal. App.3d 1487 [279 Cal.Rptr. 558].) If the objectors fail to exhaust their administrative remedies they are foreclosed from raising issues before the trial court not properly raised during the administrative hearing process.

Appellants attempted to subpoena parties and notice depositions; respondents filed a motion to quash. In each hearing before the court appellants failed to make a sufficient showing to justify said discovery in a limited review situation. Appellants had participated in the public hearings and were given an opportunity to present evidence and raise whatever issues they thought were important and relevant. Their failure to raise an issue or present evidence at the public hearings operates as a waiver of presenting such evidence or raising said issue before the trial court, whose function it is to review the record. The record exceeded 9,000 pages in length. Appellants were afforded an opportunity to review, challenge and proffer supplements to the record of proceedings. Appellants are not entitled to present additional or new evidence at the trial; thus discovery pertaining to the introduction of new evidence is to be severely limited and within the sound discretion of the trial court. In the matter of *Kahn* v. *East Bay Mun. Util. Dist.* (1974) 41

Cal.App.3d 397, 402 [116 Cal.Rptr. 333], the petitioner attempted to introduce before the trial court evidence of water rates charged in some 23 communities to challenge the rates set by the municipal utility district. Said evidence was rejected in that petitioner was present at the public hearing on the setting of the water rates, and although he objected to the rates, he presented no evidence to support his objections. Thus, he could not present additional or new evidence to the trial court not introduced at the hearing.

After the trial court had certified the record of proceedings as complete for purposes of review, the court denied appellant's renewed motion for discovery. Thereafter the court ruled on other requests for depositions and discovery. At each hearing appellant was permitted to make a showing that the documents sought or depositions requested were relevant and material to the preparation of their case for trial and had not been previously produced. Each time, the trial court denied the discovery after full consideration of the motions. The trial court exercised its discretion in determining whether the discovery sought would lead to relevant and material evidence. Appellants have failed to show that the trial court abused its discretion. Appellants sought to discover information which they could have sought and presented at the public hearings and has failed to show said information was not available at the time of the public hearings. (*Jeffery* v. *City of Salinas* (1965) 232 Cal.App.2d 29, 39 [42 Cal.Rptr. 486].) Failure to raise an issue in protest at the public hearing constitutes a waiver of the right to have that issue determined by the council or the court.

■ Discovery statutes vest a wide discretion in the trial court, and exercise of that discretion will be disturbed only when it can be said there has been an abuse of discretion. ■ An order compelling discovery must rest on a showing that the discovery is reasonably calculated to lead to admissible evidence in an administrative mandamus proceeding. (*Mobil Oil Corp.* v. *Superior Court* (1976) 59 Cal.App.3d 293, 304 [130 Cal.Rptr. 814]; *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 774-775 [122 Cal.Rptr. 543, 537 P.2d 375].)

■ On April 18, 1988, appellant Nelson filed a petition for a writ of mandate with the appeals court to seek appellate review of a discovery protective order issued by the trial court. It was denied for failure to show an abuse of discretion.

*The Trial Court Correctly Applied the Appropriate Standard of Review.*

■ The trial court correctly determined that there was substantial evidence to support the actions of respondents. It is not for the trial court to

involve itself in the decision-making process of a redevelopment agency and a city council; the Legislature delegated legislative decisions to those agencies and not to the courts. Judicial review is limited to whether there was substantial evidence to support the legislative decisions. (*In re Redevelopment Plan for Bunker Hill, supra*, 61 Cal.2d 21, 40; *Sanguinetti v. City Council* (1965) 231 Cal.App.2d 813, 817 [42 Cal.Rptr. 268]; *National City Business Assn. v. City of National City* (1983) 146 Cal.App.3d 1060, 1065 [194 Cal.Rptr. 707]; *Fosselman's Inc. v. City of Alhambra, supra*, 178 Cal.App.3d 806, 811-812.) "The de novo type of review does not apply to quasi-legislative acts of administrative officers and judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious or entirely lacking in evidentiary support." (178 Cal.App.3d at p. 812.)

The agency and the city council have authority to designate redevelopment areas and the court is not empowered to substitute its determination for the determination of the agency or the legislative body. (*Babcock v. Community Redev. Agency* (1957) 148 Cal.App.2d 38 [306 P.2d 513].) "The trial court was correct in its refusal to reweigh the evidence and in confining itself to determining whether the findings and determinations of the inferior bodies were supported by substantial evidence. . . . The trial court was correct in its refusal to exercise its independent judgment on the evidence upon which the agency and the city council acted." (*In re Redevelopment Plan for Bunker Hill, supra*, 61 Cal.2d 21, 40-41.)

Appellants urge that the trial court applied the improper standard of review by determining that all of the acts of the agency and city council were quasi-legislative, whereas appellants argue that certain acts such as the finding of blight and the factual findings that the Plan is economically sound and feasible and that the Plan conforms to the general plan of the community, require factual findings which are quasi-judicial in nature.

A redevelopment plan is a comprehensive method to carry out the redevelopment of an area. Although the process of adoption of a plan provides for the holding of public hearings and the taking of testimony along with examination of various criteria in arriving at its determinations, these determinations remain essentially legislative in character (*City of Santa Cruz v. Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 388 [142 Cal.Rptr. 873]). "An administrative agency such as LAFCO is nonetheless quasi-legislative in nature, though it holds public hearings and considers 'testimony presented by any . . . interested person who wishes to appear.' . . . The Legislature and administrators exercising quasi-legislative powers commonly resort to the hearing procedure to uncover, at least in part, the facts necessary to arrive at a sound and fair legislative decision. . . . Hence the

presence of certain characteristics common to the judicial process does not change the basically quasi-legislative nature of the subject proceedings." (*Ibid.*)

*Sanguinetti* v. *City Council, supra,* 231 Cal.App.2d 813, 817-818: "First it is to be observed that while the statutes refer to 'findings' to be made by the legislative body, in this case the city council, the word 'findings' is not to be equated with that term as used in statutory provisions as to judicial proceedings. The hearing before the city council is not a judicial proceeding, nor is it required to be carried out with all the nicety or requirements for such proceedings. By the word 'findings' the Legislature plainly refers to certain specific determinations to be arrived at by the city council as a prerequisite to adoption . . . . Of course, the law does not contemplate that the legislative body will adopt a proposed redevelopment plan without determining generally that it complies with the applicable law and will be for the benefit of the community to be affected . . . . But all this is not to say that the Legislature required specific 'findings' and determinations in exact accord with the legislative language. Substantial compliance . . . is sufficient."

The California Legislature has delegated to redevelopment agencies as legislative bodies the power and authority to determine blight and effectuate redevelopment. (*In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, 52.) The court's function is to review the administrative record to determine if there is substantial evidence to support the determination of the administrative agency.

It is only in those cases, unlike the facts herein, where a party has acquired a fundamental vested right and the administrative decision substantially affects that fundamental vested right that the court will conduct an independent review of the evidence and the record. In those cases the vested right is deemed substantially significant to preclude its extinction by a body lacking judicial power. However, this must be decided on a case by case basis. (*Whalers Village Club* v. *California Coastal Com.* (1985) 173 Cal.App.3d 240, 251 [220 Cal.Rptr. 2]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 146 [93 Cal.Rptr. 234, 481 P.2d 242]; *301 Ocean Ave. Corp.* v. *Santa Monica Rent Control Bd.* (1991) 228 Cal.App.3d 1548 [279 Cal.Rptr. 636].)

*There Is No Credible Evidence of Fraud by the CRA or the City in the Formation or Adoption of the Plan.*

Appellants convinced the trial court to permit testimony and documentary evidence, not contained in the administrative record, to support their allegations of fraud in the formation and adoption of the Plan.

The trial court made express findings that appellants "produced no credible evidence supporting any of their fraud allegations against the Agency and the City of Los Angeles."

Appellants were granted wide latitude in the presentation of evidence, the hearing commenced on May 27, 1988, and concluded on September 23, 1988, and encompassed 60 one-half days of trial. Appellants called 34 witnesses and offered 116 exhibits outside the record of the administrative proceedings. The court admitted 42 of the exhibits and after having weighed all of the testimony and evidence negated the fraud allegations.

■ Unlike its review of the administrative record the trial court undertook an independent, de novo review of appellants' fraud allegations. Although appellants have urged numerous allegations of fraud, each and every such allegation was rejected by the court after reviewing the evidence as being "not credible." (*Johnson* v. *Pacific Indem. Co.* (1966) 242 Cal.App.2d 878, 880 [52 Cal.Rptr. 76].) The trial court, as "[t]he trier of fact is the sole arbiter of all conflicts in the evidence, conflicting interpretations thereof and conflicting inferences which reasonably may be drawn therefrom; is the sole judge of the credibility of the witnesses . . . and, in the exercise of sound legal discretion, may draw or may refuse to draw inferences reasonably deducible from the evidence." Also see *Milligan* v. *Hearing Aid Dispensers Examining Com.* (1983) 142 Cal.App.3d 1002, 1005 [191 Cal.Rptr. 490]: The court's function ". . . is to review errors of law and not pass on questions of fact. Even where a trial court must exercise its independent judgment on the evidence, the power of appellate courts begins and ends with a determination as to whether there is *any* substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." The appellate court will not disturb findings of fact which support the trial court's orders; so far as it has passed on the weight of the evidence, the trial court's findings are conclusive. (*Bailey* v. *County of Los Angeles* (1956) 46 Cal.2d 132, 137 [293 P.2d 449].)

The court found that the agency complied with the law in giving notice of the formation of the PAC and proper notice of the joint public hearings; that the agency neither manipulated nor dominated the PAC; that the operations of the PAC were open and democratic; that the PAC was independent; and that all hearings were well publicized and well attended and all public concerns were well aired.

*The Redevelopment Plan Is Consistent With the City of Los Angeles General Plan.*

■ Appellants are requesting the court to invalidate the redevelopment plan by collaterally attacking the City of Los Angeles General Plan. The

record of proceedings establishes the existence of a general plan for the City of Los Angeles. (Record exhibits 65, 65A, 65B.) The Plan is a lengthy document containing maps, text and diagrams. The city planning commission considered and reviewed the Plan and found that it conformed to the city's general plan.

The city's general plan was adopted at least 10 years prior to the adoption of the Project in May 1986. The most liberal statute of limitation applicable to a challenge to the general plan would be Code of Civil Procedure section 343 which provides, "an action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued." It is untimely for appellants to attack the general plan.

SHOT, an appellant herein in another case, previously challenged a trial court's determination that the plaintiff was barred by Code of Civil Procedure section 343 from attacking the sufficiency of the general plan. In an unpublished opinion the Appeals Court upheld the trial court's decision. (*Save Hollywood Our Town* v. *City of Los Angeles* (1988) B030192). The same parties are before the court with the same issue for determination.

The trial court's determination that the Hollywood redevelopment plan conforms to the city's general plan is supported by substantial evidence.

*The Award of Costs Against SHOT Appellants Was Proper.*

The CRA and the City of Los Angeles filed a cost bill in the amount of $18,560.16;, the court awarded costs against the SHOT appellants, and Susan Nelson, Karen Hale Wookey, Jamie Riehl and Katherine Armour only in the amount of $6,133.15. The court exercised its discretion in reducing the amount of costs requested. The parties against whom costs were assessed are not property owners within the project area.

 Appellants contend that under the reasoning of *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, 71, costs cannot be assessed against an objector in validation proceedings. In the *Bunker Hill* case the court held: that the clearance of blighted areas and the redevelopment thereof are public uses; that a property owner in the redevelopment area may be reluctant to give up her property resulting in eminent domain proceedings; and that even though the party may not prevail in the trial court or on appeal she would be entitled to be free from costs in litigation of the action. (*Collier* v. *Merced Irr. Dist.* (1931) 213 Cal. 554, 572 [2 P.2d 790].) The owner is entitled to full compensation for her property, free from costs.

The appellants herein who have been ordered to pay costs are not property owners within the project area. Their property will not be subject to condemnation and thus the assessment of costs would not reduce the value of their property.

The court specifically struck costs against any appellants who owned real property within the project area to conform to the *Bunker Hill* holding.

As the prevailing parties the respondents are entitled to the costs in the reduced amount awarded by the trial court. (*Catello v. ITT General Controls* (1984) 152 Cal.App.3d 1009, 1013 [200 Cal.Rptr. 4]; Code Civ. Proc., §§ 1032, 868.)

The judgment is affirmed.

Johnson, Acting P. J., and Woods (Fred), J., concurred.

The petitions of all appellants for review by the Supreme Court were denied August 22, 1991.