[Civ. No. 10824.   Third Dist.   Jan. 22, 1965.]

M. A. SANGUINETTI et al., Plaintiffs and Appellants, v. THE CITY COUNCIL OF THE CITY OF STOCKTON et al., Defendants and Respondents.

Donald D. Boscoe and Maxwell Freeman for Plaintiffs and Appellants.

Monroe N. Langdon, City Attorney, Elwyn L. Johnson, Deputy City Attorney, and John A. Wilson for Defendants and Respondents.

VAN DYKE, J.†—This is an appeal from a judgment of the Superior Court of San Joaquin County discharging an alternative writ of mandate. Proceedings in the trial court were commenced by appellants, as petitioners, by the filing on December 1, 1961, of a petition for a writ of mandate enjoining the respondent, Redevelopment Agency of the City of Stockton, from executing the official redevelopment plan for "West End Urban Renewal Project No. 1" and commanding the respondent, City Council of the City of Stockton, to repeal and rescind Ordinance No. 686-C.S. of the City of Stockton which approved and adopted the plan. The ordinance had been passed and adopted on October 9, 1961, following public hearings. Judgment, after trial, was given in favor of respondents and the alternative writ theretofore issued was discharged. A motion for a new trial was denied.

The proceedings under review were taken under the Community Redevelopment Law of this state as defined in section 33000 et seq. of the Health and Safety Code, being part 1, division 24, of the code as it read on October 9, 1961.[1] For a concise statement of such proceedings see *Berggren* v. *Moore*, 61 Cal.2d 347, 349-350 [38 Cal.Rptr. 722, 392 P.2d 522].

During the trial there was received in evidence what appears to be a complete documentary history of proceedings taken by the city council, the city planning commission, and the redevelopment agency, culminating in the ordinance adopting the plan. The record covers a number of years. Without going into detail, it appears that the matter of redeveloping the area included in the adopted plan has been the subject of intensive study and consideration of all three agencies involved and that these agencies have called to their aid not only the work of their own staffs but also studies made by other public and private organizations possessing expert knowledge and experience in the field. The matter of adoption or rejection of the plan was before the city council for more than five months.

---

†Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]The Community Redevelopment Law was revised in 1963 and section numbers were changed. For convenience we will refer to the section numbers as they stood before revision, indicating in each instance, however, the current number.

After the redevelopment agency had adopted the plan and had reported it to the city council, a public hearing thereon was noticed for August 2, 1961. The plan was adopted on October 9. In the meantime, a number of meetings of the city council had been devoted to consideration of the plan. During the several hearings many people and many organizations, some represented by attorneys, addressed the city council in support of or in opposition to the plan, or parts of it, and numerous letters from interested parties were received, considered and filed. The proceedings were informal, but it clearly appears that the plan received full consideration and that all persons and organizations desiring participation were heard.

In reviewing proceedings had under the Community Redevelopment Law, the trial court does not exercise its independent judgment on the evidence on which the redevelopment agency and the city council acted but confines itself to determining whether their findings and determinations are supported by substantial evidence. (*In re Redevelopment Plan for Bunker Hill etc. Project,* 61 Cal.2d 21 [37 Cal.Rptr. 74, 389 P.2d 538]; *Berggren* v. *Moore, supra,* 61 Cal.2d 347.)

Appellants first contend that the city council failed to make the findings required by the Community Redevelopment Law to be in the ordinance approving the plan. First, it is to be observed that while the statutes refer to "findings" to be made by the legislative body, in this case the city council, the word "findings" is not to be equated with that term as used in statutory provisions as to judicial proceedings. The hearing before the city council is not a judicial proceeding, nor is it required to be carried out with all the nicety of requirements for such proceedings. By the word "findings" the Legislature plainly refers to certain specific determinations to be arrived at by the city council as a prerequisite to adoption. The code sections upon which appellants rely require certain specific determinations to be made by the city council. If the plan provides for condemnation as a means of acquiring title to property, the legislative body must find that condemnation is necessary and that adequate provisions have been made for payment for property to be acquired. (§ 33736, now § 33367, subd. (e) (6).) If relocation of displacees is proposed, there must be a finding that a feasible method for such relocation has been adopted by the redevelopment agency (§ 33738, now § 33367, subd. (e) (7) and (8)), and that the plan provides for relocations, either in the project area or in other areas not generally less desirable, with com-

parable rents or prices to those being paid for like accommodations in the project area. The legislative body must find that the area is in fact a blighted area suitable for redevelopment in order to effectuate the public purposes of the law. (§ 33731, subd. (a), now § 33367, subd. (e) (1).) Of course, the law does not contemplate that the legislative body will adopt a proposed redevelopment plan without determining generally that it complies with the applicable law and will be for the benefit of the community to be affected. Apparently, the Legislature was especially concerned with the specific matters above related and required that the legislative body find and determine that the specific requisites existed. But all this is not to say that the Legislature required specific ''findings'' and determinations in exact accord with the legislative language. Substantial compliance with the legislative requirements is sufficient.

■ Section 33731, subdivision (a) (now § 33367, subd. (e) (1)), of the code provides that the city council shall find that ''The project area is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this part.'' Appellants assert lack of such a finding. The ordinance contains a specific finding reading: ''That the Project is a blighted area and qualifies as an eligible Project area under the Community Redevelopment Law of the State of California.'' That is sufficient.

■ Health and Safety Code section 33736 (now § 33367, subd. (e) (6)) provides: ''If the plan provides for the condemnation of any real property, the legislative body shall not approve the plan except upon a finding that condemnation is necessary to the execution of the plan. . . .'' Appellants contend that the ordinance does not contain such a finding. In the ordinance under the heading ''FINDINGS'' is a statement ''That the Redevelopment Plan contains a finding by the Agency that the condemnation of real property within the project area is necessary to the execution of the Redevelopment Plan. . . .'' The plan itself, thus referred to, declares ''Said redevelopment is possible only with the use of eminent domain.'' The foregoing, together with the adoption of the plan by the ordinance, is sufficient to supply the requisite finding as to the necessity of condemnation. Indeed, when the plan adopted is considered in its entirety, it is obvious that in all probability title to the entire area could not be acquired by negotiation and voluntary sale to the agency and that condemnation of at least part of the area would be necessary.

■ Section 33736 (now § 33367, subd. (e) (6)) of the code provides: "If the plan provides for the condemnation of any real property, the legislative body shall not approve the plan except upon a finding that . . . adequate provisions have been made for payment for property to be acquired as provided by law."

Referring to the plan the ordinance states that it contains a finding by the agency that adequate provision for the payment for property "so acquired as provided by law" is contained therein. That the plan so referred to does contain adequate provisions for the payment for property is not disputed or disputable. The requisite finding is sufficiently made.

■ Section 33738 (now § 33367, subd. (e) (7) and (8)) of the code provides: "If a plan may result in the temporary or permanent displacement of any occupants of housing facilities in the project area the legislative body shall not approve the plan except upon a finding that the agency has a feasible method or plan for the relocation of families and persons displaced from the project area. . . ."

The ordinance contains these specific findings upon this subject: "That adequate permanent housing facilities are or will be made available in the County of San Joaquin, being the county in which the housing facilities to be displaced are located, for such displaced occupants reasonably convenient to their needs as determined by the Agency and at rents comparable to those in the community at the time of their displacement.

"That permanent housing facilities will be made available within three years from the time any occupants of housing facilities in the Project Area are displaced and that pending the redevelopment of such facilities there will be available to such displaced occupants adequate temporary housing facilities at rents comparable to those in the community at the time of their displacement.

"That the proposals for the proper relocation of the families displaced in carrying out the Project in decent, safe and sanitary dwellings in conformity with acceptable standards are feasible and can be reasonably and timely effected to permit the proper prosecution and completion of the Project; and that such dwellings or dwelling units available or to be made available to such displaced families are at least equal in number to the number of displaced families, are not generally less desirable in regard to public utilities and public commercial facilities than the dwellings of the displaced families in the

Project Area, are available at rents or prices within the financial means of the displaced families, and are reasonably accessible to their places of employment.''

When these specific findings are read together, they constitute a sufficient compliance with the statutory requisite that the city council determine that the agency has a feasible method or plan for the relocation of families and persons displaced from the project area.

The relocation plan, which is a plan within a plan, occupies some 45 pages of the record. The following is a summarization of its essential features. The agency, prior to the adoption of the relocation plan, had set up within itself a relocation section which had been handling the relocation activities under a prior project and was nearing completion of that work. This relocation section was staffed with a relocation administrator directly responsible to the agency, a property manager, three relocation aides, two stenographer-clerks, and a maintenance man. The section was to undertake and complete all actions necessary for the relocation of families, individuals and businesses, including development of available housing listings and dissemination to residents of all information necessary to expedite relocation and inform them of available assistance. It was the work of the section to cooperate with all public and private agencies concerned with the moving of families, individuals and businesses. The section was to establish an office in or near the project area in order that persons affected would have easy access to its services and could readily secure prompt help on relocation problems. Relocation standards were adopted in the plan. Estimates of rents in relation to income had been made. Contacts for exchange of information as to available housing had been set up with realty boards, individual owners and other sources of information, and card files on rentals were to be maintained in the project office. Listings were to be prepared for use of landlords and owners having housing for rental or sale, and it was planned that all housing referrals received would be inspected promptly after receipt of notice. Constant checks were planned to be kept on newspaper advertisement for available rentals, and one experienced person was to be steadily assigned to this work. The work included a constant driving through sections of the town to locate ''for-rent'' signs and secure data and make inspections at the time of discovery. The public housing authority had given preference to displaced families from the prior project and had promised to continue that policy. The

rehousing needs of probable displacees had been analyzed and knowledge of probable available houses had been obtained. Arrangements had been made for interviews with site occupants to be started before acquisition of property occurred. Cooperation with the Stockton Realty Board had been secured, including use of the multiple listing service as the source of information relative to proper housing for displacees. Provision was made for defraying moving costs of displacees and on proper occasions for payment for property loss through displacement. A system had been set up for the submission of claims for such relief and a method of payment after investigation was provided. It was stated that since California law required that single individuals be considered as families for the purposes of relocation the plan recognized and complied with this requirement. In a "NARRATIVE STATEMENT" the problems of relocation were discussed.[2]

---

[2] "The Relocation Problem in this project divides itself basically into two parts insofar as Agency has responsibility for providing relocation housing for those displaced. The first portion of the problem is the relocation of approximately 47 families who live in the Project Area. The second portion of the problem is the relocation of approximately 770 single men who are permanent residents of the area by virtue of having lived at the same location in the Project Area for a period of 90 days or longer, and as many of the remaining 675 transients as are residents in the Project Area coincident with the acquisition of properties.

"These two parts of the relocation problem have been considered and analyzed separately, and relocation housing resources have been found in sufficient quantity to rehouse the numbers to be displaced in each of these cases. Information concerning the size of the population to be relocated and hotel housing resources available for this relocation was computed from an 'Analysis of Transient Housing Accommodations' made for the Agency by Western Real Estate Research Corporation. Agency surveys, including physical counts and inspections of rooms and apartment houses suitable as relocation resources also covered rent paying and income and employment characteristics of the population. Additionally, comparisons and cross references to the statistics thus compiled were made to studies of this area made by the Community Council of Stockton and San Joaquin County and other City instituted studies including but not limited to, those listed hereinbelow. Comparison of the Agency's information with these other studies generally indicates the accuracy and validity of the current reports.

"(1) Transient and Permanent Residents and Managers, August, 1957 (Entire Skid Row Area—15 blocks), Special Report to City Manager and Planning Commission.

"(2) Subcommittee on Urban Renewal and Transient Relief—Community Council's reports—1958.

"(3) Skid Row as a Social System—James Rooney, 1957.

"(4) Mission Report—City of Stockton, John Lilly."

The agency survey disclosed 47 families living within the area, 8 of the 47 families were owners and 22 had an income of $400 a month or more. Without going into further detail the narrative contained a statement that little difficulty was expected in relocating families since the factual

822

■ Appellants attack the relocation plan, asserting "The Relocation Plan is Unlawful." They assert further that the city council, in adopting the plan, acted arbitrarily, capriciously and in abuse of discretion, "since the *relocation* plan . . . is legally and morally defective." We have endeavored to recite enough of the contents of the relocation plan to show that these charges cannot be sustained. A relocation plan which becomes effective during actual displacement of inhabitants of a redevelopment area cannot be specific in the sense of acquiring and holding ready for occupancy suitable relocation sites for displacees, nor can anyone know exactly how many relocations will be required at any specific future date. Many persons, perhaps most persons, inhabiting an area subject to redevelopment will, forehandedly and in anticipation of displacement, provide their own relocations. Certainly they are not compelled to go where the agency wants them to, or into quarters which the agency has made available. Essentially the plan must be a plan or scheme of action to be taken in the future as need arises, sufficiently implemented to meet the

---

indications gained from surveys were that housing was easily obtained within the pay capacities of the families. It was said further that the largest numerical relocation would affect the single male population utilizing the 9 blocks of Stockton's West End "Skid Row" area, and that the agency would be responsible for the relocating of all such residents. It was concluded that by using the average hotel occupancy percentage given in the "Western Real Estate Research Corporation's Transient Housing Analysis" the average single man population in the 9-block area was approximately 1,445 men. Of this number a little more than one-half, or 770 single men, had lived in the project area 90 days or longer and thus were to be considered as permanent residents eligible for relocation payments. The remaining 675 single men were considered to be transient, some of whom would undoubtedly relocate prior to acquisition of properties by the agency, but for whom facilities nevertheless must be available. This single male population was being housed in 58 hotels and two dormitory facilities within the 9 blocks of the project area. There were 60 existing hotels meeting agency relocation standards (which would remain after redevelopment) in the central downtown area which in combination with other facilities could provide relocation accommodations in conformity with agency standards for the single male population. The transient housing study gives an approximate total of 2,217 sleeping accommodations in the 60 hotels with an average of 777 unoccupied beds. The agency studies revealed that relocation of the single male population would occur over a three-year period and that throughout any given year, during both peak occupancy and minimum occupancy periods, this average number of unoccupied beds would be applicable to relocation sources. The agency surveys revealed the existence of 105 apartment units renting for $45 a month or less and available as a relocation resource for the single male population each year; that there were an additional 90 apartment units available annually in the area surveyed in the $50 to $60 a month range providing a relocation resource which could be utilized for some of the 177 single men in the area who

fluctuating demands of people being displaced from time to time. Here the plan shows a subagency whose efforts are devoted exclusively to problems of relocation, staffed with experienced and competent people who have already met in other redevelopment projects the problems to be anticipated, actual financial aid has been provided for, and many precautions have been taken for the prompt and adequate finding of relocation sites. Attention has been specifically paid and provision made for obtaining sites, not only comparable to the dwellings being vacated but within the financial reach of the displacees and at prices comparable to those they have been subject to.

The plan recognizes that the problem of providing for transients is a special one. It is this part of the relocation plan that is the special target of appellants' attack. There is nothing permanent about the inhabitancy of transients in any area of a city. Transients are transient. They come and they go. The agency, in adopting the relocation plan after extensive investigation and analysis of the problem with regard to individuals, found that there were 770 single men in the project area who were classified as permanent residents thereof, that is, individuals who had been in the area 90 days or more, and that these individuals could be relocated in the immediate vicinity of the project area; it was found that there were 675 transient individuals affected, that is, those living in the area for periods less than 90 days, and that these were predominantly agricultural workers. It was found that 442 transients could be relocated in the immediate vicinity of the project area and

---

were earning $2,000 per year or more. In addition to these resources, agency staff investigation disclosed the existence of two labor camps operating on the south edge of the city which would well serve as relocation resources. Both were registered State Farm Labor Camps, inspected on a regular basis by the California Division of Housing, and had adequate electrical and heating facilities, inspected and approved by the building department of San Joaquin County. These two labor camp facilities provided a relocation resource for that portion of the single male population in ''Skid Row'' who were agricultural workers gainfully employed on farms, orchards and vineyards in the Stockton area. The labor camps are standard housing for these single male residents of the project area. These camps were in full operation during the months of March to November but would be operated on a complete year-round basis and changes in the recreation and restaurant facilities would be made in order to attract the business of the single man population to be relocated. Because these camps have not in recent years operated at full capacity, the operators were desirous of making them as attractive as possible for increased business from the West End Area. It was stated that a surplus of single male facilities, numbering 732, existed and that relocation from this West End Project No. 1 could be accomplished with existing facilities.

that the remaining transients could be located, if necessary, in two registered State Farm Labor Camps, which, as found by the agency, met the requirements of the Community Redevelopment Law. As a plan or scheme of projected action, the redevelopment plan meets the requirements of the Health and Safety Code. And certainly, it cannot be said that the city council acted arbitrarily or capriciously in approving the plan of relocation, for the record shows that a great deal of time was spent upon that matter and a great deal of information and evidence pro and con was received.

Appellants contend that the relocation plan is unlawful because it has not been approved by the Board of Supervisors of San Joaquin County and they quote paragraph 2 of section 33738 of the code (now part of § 33367), reading as follows: "If it is necessary to make available *permanent* housing facilities for displaced occupants in such county outside the agency undertaking the plan, such activity shall be subject to the approval of the governing body of such county or of the city in which the housing is made available." (Italics supplied.) Appellants assert that the Board of Supervisors of San Joaquin County has never approved the relocation plan "for displacement of persons from the project area to the unincorporated area of the County of San Joaquin." Appellants say that the relocation plan "provides for housing residents in old labor camps 6 miles from the project area in the unincorporated area of the County." The plan shows no necessity for "permanent housing facilities" outside the agency undertaking the plan, that is, in this case outside the City of Stockton. Additionally, it is only if it becomes necessary to make available *permanent* housing facilities for displacees outside the city that intended relocations of that kind require approval of the board of supervisors. Such approval was unnecessary under the plan of temporary relocation adopted by the agency and may never become necessary.

Appellants contend that the ordinance is illegal for failing to incorporate the plan by reference and they quote a portion of section 33742 (now § 33367, subd. (c)), which provides: "The approval of a redevelopment plan by a legislative body shall be by ordinance. The ordinance shall: . . . (d) Incorporate the plan by reference." Section 3 of the ordinance provides: "That the said Official Redevelopment Plan for West End Urban Renewal Project No. 1, dated April 6, 1961, heretofore submitted to this Council by Agency, is hereby approved and adopted." Other sections of the ordinance

specifically and in detail describe the plan and its contents. Such a reference to the plan unmistakably identifying it as being the subject of the ordinance, followed by formal approval and adoption thereof, sufficiently incorporates the plan into the ordinance by reference and meets the requirements of the statute.

Appellants contend that the owner participation provisions of the plan and ordinance deny to them and to those similarly situated the equal protection of the law. This assignment has reference to the fact that the redevelopment plan designates three parcels only out of all the parcels within the 9-block area as being eligible for owner participation.

The Community Redevelopment Law permits, but it does not require, owner participation, and whether or not and in what instances owner participation may be permitted is necessarily confided to the sound judgment of the agency in the adoption of the plan. As was said in *Fellom* v. *Redevelopment Agency*, 157 Cal.App.2d 243, 250 [320 P.2d 884] "[I]t is also apparent from a reading of all the sections and the entire law that there is provision for a method of redevelopment without participation by the owners of the land. For instance, the express power of eminent domain would negate the necessity of participation by the owners, if the agency in its exercise of its constitutional powers acts fairly and without discrimination." And in *In re Development Plan for Bunker Hill etc. Project, supra,* 61 Cal.2d 21, the Supreme Court said at pages 59 and 60: "That there is no absolute right of owner participation in the redevelopment of each separately owned parcel of land within the project area is apparent from the provisions of section 33701 (now § 33339) itself in that it provides that as a condition thereof an owner desiring to participate must agree 'to participate in the redevelopment in conformity with the redevelopment plan adopted by the legislative body for the area.' . . ." The law contemplates that in a redevelopment area it may often be necessary to realign streets and parking areas and the like, and this may result in structures, suitable so far as meeting all requirements of building laws be concerned, being demolished and removed in order to meet the overall requirements of the redevelopment plan. The law recognizes that in developing and executing a redevelopment plan it may be necessary to include buildings that are not blighted but whose inclusion is necessary for the effective redevelopment of the area of which they are a part. Section 33004 (now § 33321) of the code provides: "A rede-

velopment area need not be restricted to buildings, improvements or lands which are detrimental or inimical to the public health, safety, or welfare, but may consist of an area in which such conditions predominate and injuriously affect the entire area. A redevelopment area may include lands, buildings or improvements which are not detrimental to public health, safety or welfare, but whose inclusion is found necessary for the effective redevelopment of the area of which they are a part." ▮▮▮▮ We find herein no denial of equal protection of the law because three parcels were designated as subject to owner participation. Nor do appellants attempt to point out in just what manner they were injured by the decision made regarding the three parcels. There is no denial of the equal protection of the law under the Fourteenth Amendment for the reason, as stated in *Redevelopment Agency* v. *Hayes*, 122 Cal.App.2d 777, at pages 805-806 [266 P.2d 105], that the taking is for a public purpose (redevelopment) and the owner is guaranteed and will receive full compensation.

No other contentions are made by the appellants. We find that the action taken by the city council in the passage of the ordinance approving and adopting the redevelopment plan was in all things done in the manner required by law and is substantially supported by the evidence before that body. Accordingly, the judgment appealed from is affirmed.

Pierce, P. J., and Friedman, J., concurred.