[No. G011278. Fourth Dist., Div. Three. Jan. 29, 1993.]

ROBERT P. GONZALES et al., Plaintiffs and Appellants, v.
CITY OF SANTA ANA et al., Defendants and Respondents.

**COUNSEL**

Jonathan Lehrer-Graiwer, Richard L. Spix and Mary Ellen Martinet for Plaintiffs and Appellants.

Edward J. Cooper, City Attorney, Robert J. Wheeler, Assistant City Attorney, Lisa E. Storck and Jose Sandoval, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

Santa Ana's Bristol Street has been described by the city's mayor as "the biggest embarrassment" in the county. City council members have termed it

a "disaster," "troubled," and in need of "help." Residents of the city have described it as "unsightly, congested," and a "mess."

The street was developed as a residential area in the 10 years following World War II, but has changed over time to mixed residential and commercial uses. Single-family houses now sit next to small businesses and "strip" shopping centers. Utility lines tower overhead, there are billboards aplenty, and a cacophony of signs dot the landscape in a haphazard mixture of old and new. We doubt anyone would disagree that the street is not one of the garden spots of Southern California.

What Bristol is not is a "slum." It bears no resemblance to Glasgow's Drumchapel or New York's South Bronx. There are no tenements; there is little graffiti. During the 1980's, the dollar volume of the street's merchants increased by 10 percent (not quite enough to keep up with inflation), and the assessed value of property actually increased at a rate more than twice the city average.

The street itself is also severely congested, and unquestionably in need of widening. No doubt motivated both by this need and a desire to replace a source of civic "embarrassment" with a source of civic pride, the City Council of Santa Ana adopted an ordinance putting the property on and near the street in a redevelopment district. The redevelopment plan envisions the transformation of Bristol from what it is today to a modern thoroughfare, complete with a landscaped median strip, new storm drains and signals and (as urban planners are wont to say) "visual continuity."

The main drawback is that some people are going to lose their homes and jobs or businesses in the process. Two of those people, an optometrist whose office is on Bristol and a single mother who lives in the redevelopment zone, instituted this lawsuit to block the project. The trial court entered judgment in the city's favor, and the plaintiffs now appeal, contending there was not enough evidence of "blight" as required by California's Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.) in the record before the city council.

As explained below, the evidence supporting a finding of blight, while "thin," manages to pass muster under the substantial evidence test. The project area undeniably suffers from overcrowding, a substantial number of dilapidated buildings, and a crime rate higher than the citywide average.

However, we cannot affirm the judgment in its entirety. The project area includes nonblighted property unrelated to the widening of Bristol Street,

and the city has not provided an adequate explanation why that property must be included. Also, Health and Safety Code section 33367, subdivision (d)(8)[1] requires redevelopment be supported by findings that there *are* or are *being provided* equivalent dwellings for those who lose their homes. There is no evidence supporting any such findings in this case.

## II. FACTS[2]

By 1987, the Santa Ana City Council had become concerned about increased traffic congestion on Bristol Street. Certain improvements needed to be made to the road to alleviate peak hour traffic congestion. To that end, city officials decided to widen the street.

They were also concerned with what were perceived to be "signs of physical, social and economic deterioration" of the surrounding area, which contained "some of the most troubled portions" of the city. They determined that a redevelopment project should be created along or near a 3.9-mile section of the street. The project would cover an area consisting of about 2,000 separate properties on 783 acres; 1,400 of these properties would not be on Bristol itself. City officials hired an outside redevelopment consulting firm to help implement the project and prepare a redevelopment plan.

During September and October 1987, the consulting firm conducted a field survey of all buildings and properties in the project area. It is undisputed the survey involved only the exteriors of the buildings.

The consulting firm rated the buildings on the basis of four categories, from A through D in descending order, the exact definitions of which are set forth in the margin.[3] Essentially, a residential building could be rated in category C (major repairs) if it required more than an estimated $5,000 in

---

[1] Unless otherwise indicated, all statutory references are to the Health and Safety Code.

[2] Our statement of facts is taken primarily from the report to the city council on the proposed redevelopment plan for the Bristol corridor redevelopment project, prepared by the redevelopment consulting firm for the City of Santa Ana in December 1988. Additional material is taken from the joint public hearings on the proposed redevelopment plan held by the city council and the city's redevelopment agency. There was, of course, no trial of the facts before the superior court. There was, as here, only a legal determination that the evidence before the city council was sufficient to support the adoption of the ordinance.

[3] Category A, Excellent/Good Condition: "Recent construction or well-maintained or rehabilitated older construction; no apparent structural deterioration or code violations."

Category B, Minor Repairs: "Less recent or older construction; visual evidence of slight or minor structural deterioration; minor code violations and/or deficiencies; probable cost to repair and bring into full code compliance less than $5,000 for residential, and less than $10,000 for commercial."

Category C, Major Repairs: "Older construction (including unreinforced masonry) or poorly maintained structure; visual evidence of moderate to heavy structural deterioration,

repairs to bring it into "full code compliance;" a commercial structure would fall into the category if the probable repair bill would exceed $10,000.[4]

The consulting firm found that of 865 single-family homes in the area, 415, or 48 percent, fell into category C and another 161, or 18.6 percent, fell into category D ("Extensive Reconstruction/Dilapidated"). Of 179 multifamily residences, 106, or 59.2 percent, were rated in category C, while another 17, or 9.5 percent, were in category D.

There were 693 commercial structures. Of these, 318, or 45.9 percent, were category C, while 68, or 9.8 percent, were in category D. Overall, of 1,854 structures in the area, 47.1 percent were rated in category C, while 13.7 percent were put in category D.

The consultants also compared the crime rate in the area with that of the rest of the city. They asserted the project area had a crime rate of 11.49 per 1,000 population for the period January through November 1987, while the rest of the city had a crime rate of 7.22 per 1,000 population. While the 11.49 figure does not appear to hold up under scrutiny, the rate does appear to be somewhat higher than the citywide average.[5]

---

such as sagging roof, walls not plumb, holes in walls, inadequate foundation; one or more major code violations and numerous minor violations and/or deficiencies; possible seismic safety problem; probable cost to repair and bring into full code compliance approximately $30,000 for residential, and $100,000 for commercial."

Category D, Extensive Reconstruction/Dilapidated: "Older and very old construction (including unreinforced masonry), or very poorly maintained or willfully damaged structure; visual evidence of heavy to severe structural deterioration, including severely sagging or partially missing or destroyed roof, leaning or missing walls, columns and posts, and window and door frames out of alignment; cracking, offset or missing foundation; two or more major code violations and extensive minor violations and/or deficiencies; probable seismic safety problem; would involve extensive reconstruction to bring up to full code compliance, with probable cost exceeding 50 percent of the value of the structure; probable demolition."

[4] This is revealed by comparing categories B and C as defined in footnote 3, *ante.*

[5] The consultants' 11.49 figure appears to be based on a total of 435 crime "incidents" (exclusive of narcotics and vice) in the project area during the period January through November 1987, and an estimated population of 5,000. Given these numbers, it is hard to see how the consultants came up with 11.49 crimes per 1,000 population. If there are 435 crimes (assuming "incidents" to be synonymous with "crimes") in an area of 5,000 population for a given period, then the crime rate is 87 per 1,000 population for that period. (This is more than *10 times* the ostensible citywide rate, and is therefore so disproportionate as to indicate an arithmetical error somewhere.)

On the other hand, if we assume the 7.22 citywide rate is calculated on a monthly basis the numbers begin to make sense. If we divide the 87 crimes per 1,000 population by the 11 months encompassed from January to November, the area's crime rate turns out to be 7.90. This figure is both in the same ballpark as 7.22 and is statistically more plausible: it would mean the project area's crime rate is about 9.4 percent higher than the rate given for the city as a whole. As there is no explanation in the consultants' report for the 11.49 figure, and we

The redevelopment plan that emerged from the consultants' work is supposed to cost $335 million. This includes the cost of new public improvements on Bristol, such as storm drains and street lights, "land assembly," a structural rehabilitation program, and deposits into a low and moderate income housing fund. About one-third of the cost, $120 million, is to widen Bristol Street. The plan covers a 35-year period, with all takings by eminent domain to be accomplished within 12 years. Tax increment revenues are projected to be $344 million over the 35-year life of the project.

In late 1987 and throughout 1988 a project area committee (PAC) made up of residents and community organizations in the project area held over 20 public meetings about the redevelopment project. The PAC voted three times on the plan. Each time the vote was against.

The Santa Ana Redevelopment Agency and city council held hearings on the plan in 1989, and in December of that year the council adopted Ordinance No. NS-2039, approving the plan. Plaintiffs' complaint followed in January 1990, alleging the plan was not really concerned with eliminating blight, but with financing the widening and improving of Bristol Street.[6] Plaintiffs also asserted the plan contained no feasible method for the relocation of families who would lose their homes to eminent domain.

 ██ █ The case came to trial in December 1990. Trial consisted essentially of oral argument over a documentary record.[7] The trial court made its decision in March 1991, finding that the plan "complies with all

cannot duplicate it ourselves given the meager information furnished in that report, we must conclude that the record does not support a higher crime rate for the project area than 7.90 per 1,000 population per month.

[6]Challenges to the validity of a redevelopment plan are specifically allowed by section 863 of the Code of Civil Procedure.

[7]The trial court excluded from consideration certain proffered exhibits (primarily a draft environmental impact report on the widening of Bristol Street and certain letters of plaintiffs' counsel objecting to the plan) on the grounds they were not part of the public record before the city council. Plaintiffs attack this exclusion on appeal. We agree with the trial court. In the absence of some showing that city staff improperly excluded the documents from the public record, judicial review of whether there was substantial evidence to support the city's decision is limited to the record before the city. (See Code Civ. Proc., § 1094.5, subd. (e); see also *Fosselman's, Inc.* v. *City of Alhambra* (1986) 178 Cal.App.3d 806, 812 [224 Cal.Rptr. 361] ["substantial evidence review of administrative action is limited to the record made before the administrative agency"].) Here, we do not find any evidence of improper exclusion on the city's part in not including the exhibits. This conclusion renders moot the city's argument that plaintiffs did not exhaust their administrative remedies as to the completeness and adequacy of the record. (See also fn. 17, *post*.)

On the other hand, we agree with plaintiff's counsel that *if* the city did knowingly refuse to include the proffered exhibits and then turned around, as it has done on this appeal, and argued that plaintiffs had failed to exhaust their administrative remedies by not raising issues set out in the exhibits, they would be engaging in conduct of "Kafkaesque proportions."

applicable statutory provisions and is valid in all respects." The city "did not abuse its discretion in that its finding of blight is supported by substantial evidence." A judgment determining Ordinance No. NS-2039 and the plan were lawful and valid without qualification was filed in May. This appeal followed.

## III. Discussion

### A. *Blight*

■ We begin with an elementary rule enunciated by our Supreme Court in *Sweetwater Valley Civic Assn.* v. *City of National City* (1976) 18 Cal.3d 270, 277 [133 Cal.Rptr. 859, 555 P.2d 1099]: "To allow redevelopment under CRL [Community Redevelopment Law], the proposed area must be blighted." Plaintiffs' primary contention in this appeal is that there is insufficient evidence the project area is "blighted" as defined by the CRL.

The question is a close one. Neither the exterior condition of the area's buildings nor the crime rate is enough by itself to show blight.

First, as to the buildings: Other than the know-it-when-you-see-it category D for dilapidated buildings (about 14 percent), the definitions used by the consulting firm do not tell us much. The demarcation line between buildings requiring "major" repairs and those requiring only "minor" ones appears drawn to bring the largest possible number into the "major" category: Any residential building requiring more than $5,000 in repairs to bring it "up to code," and any commercial building requiring more than $10,000 in such repairs falls into category C. Thus we do not know (and cannot figure out) how many of the roughly 48 percent of the buildings in this category really approach something that is, in the words of section 33031, "conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime." Absent tighter definitions, we are loathe to declare the evidence sufficient based on the number of structures which have (perhaps arbitrarily, perhaps not) been grouped into the "major repair" category.

Second, as explained in footnote 5, the crime rate appears only marginally higher than the citywide average.[8] It is nowhere near as disproportionate to the citywide average as found in other cases where there was substantial evidence of blight. (Cf. *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21 [37 Cal.Rptr. 74, 389 P.2d 538] [double city average]; *Morgan* v. *Community Redevelopment Agency* (1991) 231 Cal.App.3d 243 [284

---

[8]Footnote 5 explains why we do not assume the crime rate is as disproportionate to the citywide rate as the consultants' report might otherwise lead one to believe.

Cal.Rptr. 745] [double city average]; *National City Business Assn.* v. *City of National City* (1983) 146 Cal.App.3d 1060 [194 Cal.Rptr. 707] [50 percent higher].)

However, in addition to the 14 percent of structures which are dilapidated, and a marginally higher crime rate, there is undeniable evidence of overcrowding. According to the report, the project area has a population density about 22 percent higher than the rest of the City of Santa Ana (3.8 persons per household as distinct from a city average of 3.1). Defining "overcrowded" to mean between 1 and 1.5 persons per room, and "severely overcrowded" to mean more than 1.5 persons per room, the report finds 14 percent of the project area units overcrowded, and 17 percent severely overcrowded. The citywide figures are 8 and 10 percent respectively, and it is common knowledge Santa Ana has an overcrowding problem. (See generally *Briseno* v. *City of Santa Ana* (1992) 6 Cal.App.4th 1378 [8 Cal.Rptr.2d 486].) It is undeniable that overcrowding, whatever its other aspects, is "conducive to ill health" and the "transmission of disease." (See Health & Saf. Code, § 33031.)

The definition of a "blighted area" has been set forth by the Legislature in sections 33030, 33031, and 33032. The first sentence in section 33030 is introductory, telling the reader that certain areas in the state are liabilities that need to be redeveloped.[9] The second refers the reader to "conditions set forth in" sections 33031 or 33032: "A blighted area is one which is characterized by one or more of those conditions set forth in Sections 33031 or 33032, causing a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical, social, or economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise acting alone."

Sections 33031 and 33032 detail a variety of "conditions." Section 33031 centers on "buildings and structures" which, in effect, are health hazards, or a cause of juvenile delinquency or crime: "A blighted area is characterized by the existence of buildings and structures, used or intended to be used for living, commercial, industrial, or other purposes, or any combination of such uses, which are unfit or unsafe to occupy for such purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of any one or a combination of the following factors: [¶] (a) Defective design and character of physical construction. [¶]

---

[9]The exact language is: "It is found and declared that there exist in many communities blighted areas which constitute either physical, social, or economic liabilities, requiring redevelopment in the interest of the health, safety, and general welfare of the people of such communities and of the state."

(b) Faulty interior arrangement and exterior spacing. [¶] (c) High density of population and overcrowding. [¶] (d) Inadequate provision for ventilation, light, sanitation, open spaces, and recreation facilities. [¶] (e) Age, obsolescence, deterioration, dilapidation, mixed character, or shifting of uses."

Section 33032 centers on some dysfunctional aspects of properties in a given location. It reads in pertinent part: "A blighted area is characterized by properties that suffer from economic dislocation, deterioration, or disuse because of one or more of the following factors that cause a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical, social, or economic burden on the community that cannot reasonably be expected to be reversed or alleviated by private enterprise acting alone: [¶] (1) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development. [¶] (2) The laying out of lots in disregard of the contours and other topography or physical characteristics of the ground and surrounding conditions. [¶] (3) The existence of inadequate public improvements, public facilities, open spaces, and utilities which cannot be remedied by private or governmental action without redevelopment. [¶] (4) A prevalence of depreciated values, impaired investments, and social and economic maladjustment."

In the present case, the clear evidence of overcrowding, combined with 14 percent dilapidation and a marginally higher crime rate, shows the area to be characterized by a "condition" in section 33031, i.e., the existence of "buildings . . . which are unfit or unsafe to occupy . . . and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of . . . [¶] (c) High density of population and overcrowding."

Our conclusion is also consistent with the cases which have addressed the quantum of evidence necessary to show blight. The two leading cases holding the evidence insufficient, *Sweetwater Valley Civic Assn.* v. *City of National City, supra,* 18 Cal.3d 270, and *Emmington* v. *Solano County Redevelopment Agency* (1987) 195 Cal.App.3d 491 [237 Cal.Rptr. 636], both involved open land. *Sweetwater* concerned a functioning golf course (of all things!) while *Emmington* concerned dry farming land.

The closest case holding the evidence insufficient is *Regus* v. *City of Baldwin Park* (1977) 70 Cal.App.3d 968 [139 Cal.Rptr. 196]. In *Regus* the project area consisted of two separate noncontiguous sites more than a mile apart along the San Bernardino Freeway. One site was north of the freeway, and consisted of mixed residential and commercial properties. The residences were " 'older stock fairly well maintained with isolated examples of

deteriorating construction.' " (70 Cal.App.3d at p. 973.) The land parcelization was irregular, and had resulted in "poorly used parcels of irregular shape and depth with minimal frontage." (*Ibid.*) Of twelve parcels surveyed at the site, only one was in excellent condition; three were older "but well maintained," three were fair, three were old and obsolete, and two were dilapidated. The area was undergoing transition. (*Ibid.*)

The other site was south of the freeway, and consisted of commercial and industrial development. Half of this site consisted of newly finished construction or construction in progress. Of nine buildings rated, three were older but well maintained, four were fair, and two were old and obsolete. (70 Cal.App.3d at p. 974.) The court held there was no substantial evidence the area was blighted. (70 Cal.App.3d at p. 980.)

If, as mentioned above, all we had before us was the exterior structural survey, the record would not support the blight finding. *Regus* demonstrates that substantial percentages of "fair," "old and obsolete," and even "dilapidated" buildings are not enough, *by themselves*, to support such a finding. But in *Regus* there was no severe overcrowding. Here there is, plus some increased crime.

Thus, while the percentage of deteriorated buildings on Bristol Street in Santa Ana may not be as high as in certain areas of downtown Los Angeles in the 1950's (cf. *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at p. 45 [60 percent were *dangerous*]) or in downtown National City in the 1970's (*National City Business Assn.* v. *City of National City, supra,* 146 Cal.App.3d at p. 1067 [60 percent beyond rehabilitation]),[10] the overcrowding plus the increased crime make up for it (cf. *Morgan* v. *Community Redevelopment Agency, supra,* 231 Cal.App.3d at pp. 255-256 [host of additional factors besides building deterioration, including homelessness and runaways dominating area, disproportionate crime, and overcrowded buildings]).

## B. *Overinclusion*

 It is one thing to determine that a given area is, even if just barely, "blighted" within the meaning of the redevelopment law. It is another to say that the boundaries of that area must necessarily encompass nonblighted property in order to effectively redevelop the area. Section 33321 allows a project area to include parcels "which are not detrimental to the public health, safety or welfare, but whose inclusion is found necessary for the

---

[10]Then again, it may be; the overbreadth of category C makes it impossible to say with certainty.

effective redevelopment of the area of which they are apart." The plaintiffs argue there is insufficient evidence that inclusion of nonblighted property is necessary to its effective redevelopment.

As to any property on Bristol, or which is reasonably affected by the widening of Bristol, the argument must necessarily fail. Obviously, a redevelopment project focused on a street widening must include the properties on that street to be effective.[11]

However, as to nonblighted property substantially removed from Bristol Street itself (i.e, not affected by its physical widening), the city has not articulated *any* concrete reason why that property is "necessary for the effective redevelopment" of the project area. The city merely cites certain all-purpose conclusory statements from the consultants' report which might apply to any property anywhere. With the exception of a brief reference to the "proposed street widening," there is no attempt at any specificity; the reasons appear to have emerged from the consultants' word processor without any thought as to why any particular parcel of nonblighted property must be taken by the government to effectively redevelop nearby blighted property.[12] While the inclusion of nonblighted property within a redevelopment project may be tested on an abuse of discretion standard (see *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at p. 50, quoting *Berman v. Parker* (1954) 348 U.S. 26, 35 [99 L.Ed. 27, 39, 75 S.Ct. 98]), fidelity to

---

[11]The plaintiffs argue, with some cogency, that the "primary purpose" of the redevelopment plan is not the elimination of blight but the widening of Bristol Street. As a factual matter, they are probably correct. The stated objectives of the plan appear to be more concerned with the benefits which will come with the transformation of Bristol Street rather than the elimination of blight for blight's sake. The problem is, the "ulterior motive" argument does not gain the plaintiffs anything. While the hope of commercial development cannot *by itself* justify the use of community redevelopment powers (*Regus v. City of Baldwin Park, supra,* 70 Cal.App.3d at p. 979; but cf. § 33071 ["a fundamental purpose of redevelopment is to . . . expand employment opportunities . . . and to provide an environment for the social, economic, and psychological growth and well-being of all citizens"]), the elimination of blight can, and plaintiffs are unable to contend that the elimination of blight is not at least *one* of the city's objectives.

[12]Here is the statement cited by the city, directly as it appears in the consultants' report:

"Certain properties within the Project Area are not deteriorated properties. These properties have been included: (1) in order to plan and carry out the Project as a uniform whole; (2) to impose uniform requirements over a geographically defined and identified area of the City; (3) because such properties will be affected by the proposed street widening program; (4) because such properties are impacted by the substandard conditions existing on surrounding properties, and correction of such conditions may require the imposition of design, development or use requirements on the standard properties in the event they are rehabilitated or redeveloped by their owners; and (5) because such properties will share in the physical, social and economic benefits which will accrue to the area through the elimination of substandard conditions, including the replacement or provision of new public improvements and facilities serving the Project area; and (6) because such properties are part of a blighted area."

section 33321 requires that there be *some* specific connection between the inclusion of nonblighted property and the "effective redevelopment" of an area. We would render the statute a dead letter if we allowed generic, "canned" reasons having no necessary relationship to any given parcel of nonblighted property to serve that purpose.

Accordingly, as to non-Bristol, nonblighted property, we must agree with plaintiffs' substantial evidence argument. The plan cannot be approved until the city shows with at least minimal specificity why nonblighted parcels not affected by the Bristol Street widening should be included in the project area.

## C. *Relocation*

Redevelopment is more than an artful way for cities to raise money for public improvements or clear slums. It often involves, as in the present case, the expropriation of the homes and businesses of poor and moderate income people. This entails some real human costs. Senior citizens are uprooted from the homes they may have planned to live in for the rest of their lives;[13] younger persons face the loss of homes for which they may have struggled dearly.[14] Thus, practically speaking, relocation is the weak link in most redevelopment projects which involve residential areas. (See Molho & Kanner, *Urban Renewal: Laissez-Faire for the Poor, Welfare for the Rich* (1977) 8 Pacific L.J. 627, 634 ["One of the most important—but least funded—aspects of the redevelopment process is the relocation of the people who are dispersed from the project area when their homes and businesses turn into rubble."].)

Accordingly, in a variety of statutes the Legislature has recognized the need to alleviate the human costs associated with redevelopment. For example, the report accompanying the redevelopment plan must contain a "method or plan for the relocation" of people who are displaced. This method *must* guarantee "that no persons or families of low and moderate income shall be displaced *unless* and *until* there is a suitable housing unit available . . . ."

---

[13]One resident of Bristol Street who served on the PAC put it this way: "My home is paid for, and I'm getting ready to retire on a fixed income. If you don't give me enough money to buy another home, then I'll probably end up out on the street . . . ."

[14]Here is the testimony of one single mother to the city council against adoption of the ordinance:

"Ms. Bugariv (phonetic): My name is Guadalupe Bugariv (phonetic), and my address is 715 South Hesperian. I would like to express my feelings by you know—well, I make my house working so, so hard for five years working about 20 hours out of 24 hours.

"For five years I work 20 hours. So I was on sleeping two or three hours because I was a mother for two childs, and I was single. So I worked so, so hard to have my own house. I feel they are going to take my house away. I feel so, so sad. Thank you. That's it."

(§ 33352, subd. (d), italics added.) Homes (i.e., "dwelling units") lost to redevelopment after September 1989 must be replaced with "an equal number of replacement dwelling units," of which three-quarters must be as affordable to the low and moderate income persons displaced by the redevelopment as their old homes. (§ 33413, subd. (a).)

And, before a city may adopt an ordinance approving a redevelopment plan, it must find and determine a number of things, including:

—the redevelopment agency "has a feasible method or plan for the relocation" of persons displaced in the project area (§ 33367, subd. (d)(7)), and

—"[t]here *are*, or *are being* provided, in the project area" or comparable areas, equivalent dwellings. (§ 33367, subd. (d)(8), italics added.)[15]

Moreover, the approving ordinance must contain a statement that the city council is "satisfied that permanent housing facilities will be available within three years from the time occupants of the project area are displaced," and there *"will be available"* adequate temporary housing in the meantime. (§ 33367, subd. (e), italics added.)[16]

■ It is these protections which plaintiffs claim were not afforded here. They contend the report and plan are full of promise of equivalent housing, but do nothing to identify that housing.[17] We agree.

---

[15]The exact language of section 33367, subdivision (d)(7) and (d)(8) is:

"(7) The agency has a feasible method or plan for the relocation of families and persons displaced from the project area, if the redevelopment plan may result in the temporary or permanent displacement of any occupants of housing facilities in the project area.

"(8) There are, or are being provided, in the project area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and persons displaced from the project area, decent, safe, and sanitary dwellings equal in number to the number of and available to the displaced families and persons and reasonably accessible to their places of employment."

[16]The exact language is: "The ordinance shall contain all of the following: . . . [¶] (e) A statement that the legislative body is satisfied that permanent housing facilities will be available within three years from the time occupants of the project area are displaced and that, pending the development of the facilities, there will be available to the displaced occupants adequate temporary housing facilities at rents comparable to those in the community at the time of their displacement."

[17]The city argues in its respondents' brief (albeit not under an appropriate heading as required by rule 15(a) of the California Rules of Court) that plaintiffs failed to exhaust their administrative remedies by not bringing the inadequacy of the housing plan to the city's attention prior to this litigation. (See generally *Redevelopment Agency* v. *Superior Court* (1991) 228 Cal.App.3d 1487, 1493 [279 Cal.Rptr. 558].) This argument fails because the city acknowledges that plaintiff "Gonzales testified at the public hearing" and "complained" about

By using the present tense (*are*, or *being* provided) in subdivision (d)(8) of section 33367, the Legislature has signaled that there must be some sort of *present* identification of equivalent housing. If a mere promise or optimistic finding that housing *will be* found were sufficient, subdivision (d)(8) would be redundant. It would add nothing not otherwise accomplished by subdivision (d)(7), which merely requires a feasible *method* for relocation, or subdivision (e), which is written in the future tense. The mere promise that replacement housing *will* be found when the need arises thus does not comport with the present tense language of subdivision (d)(8).

In the present case, nothing in the report or redevelopment plan identifies where equivalent housing is or "is being" built. Indeed, the "Neighborhood Impact" section of the consultant's report is quite frank in admitting that such housing is presently *unknown*: "The specific number and type of replacement housing units required pursuant to CRL Section 33413, if any, are not known at this time since the Agency has not determined specific acquisition sites." Indeed, after noting that up to 133 replacement housing units could be required over the life of the project, the report put the problem off for another day: "The City Council and the Agency *will* make findings necessary to provide such housing either inside or outside the Project Area. When the Agency acquires property, enters into a disposition and development agreement, participation agreement or other agreement, or undertakes any other activities requiring or causing the destruction or removal of housing units from the low and moderate income housing market, the Agency *will adopt* a replacement housing plan and *will provide* replacement housing required pursuant to Section 33413 of the CRL."

---

"displacement of residents and businesses." Common sense dictates that the issue of "displacement" encompasses the issue of where the displaced persons will go. Raising the issue of "displacement" should therefore be enough to preserve the issue of the adequacy of a housing plan which was drawn up to address the very problem of displaced persons. (See *East Peninsula Ed. Council, Inc.* v. *Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 176-177 [258 Cal.Rptr. 147] ["Less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding because in administrative proceedings parties generally are not represented by counsel."].)

Moreover, besides being raised by plaintiff Gonzales, the issue was also raised in the minutes of a PAC meeting held December 13, 1988 [testimony that "there is no adequate replacement home program at all"], in the testimony of Nativo Lopez of Bristol Street before the city council ["what housing will be constructed by the City because of the number of units that will be destroyed as a result of this project"], and, perhaps most eloquently, by the citizens whose testimony is quoted, *ante*, at footnotes 13 and 14. (See *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 267-268 [104 Cal.Rptr. 761, 502 P.2d 1049] [plaintiff need not personally raise issue if otherwise expressed to administrative agency].)

By the same token we also reject the city's suggestion that the plaintiffs failed to preserve the overinclusion issue (see pt. III.B., *ante*). In hearings held in November 1989, Council member Pulido specifically brought to the council's attention the fact the project included properties "that are not part of the 20 key development sites, that are not part of the Bristol Widening Project, that are not blighted."

These are fine promises, but we must uphold the law which requires evidence that such units are either in existence, or "are being" brought into existence. The city makes no argument that there is any such evidence.[18]

Rather, on appeal the city argues it is sufficient to provide a "framework" for complying with the law requiring relocation housing, because "35 years of activity . . . cannot be set forth in minute detail." The city's only authority for this proposition, *County of Santa Cruz* v. *City of Watsonville* (1985) 177 Cal.App.3d 831 [223 Cal.Rptr. 272], does not support it.

In *Watsonville*, a city established a 257-acre redevelopment area which included some land under county jurisdiction. The city needed the county's permission for redevelopment, and apparently some city employees told the county that the city's idea was simply to build a road on county land for fire protection purposes. Given the modest scope of what it perceived to be the city's plan, the county gave its approval. The actual plan, however, made only a single reference to the road extension, and indicated a number of general projects.

After approval, the city spent over a million dollars on street construction——but not the fire access road—and the county brought suit against the city, seeking to limit the scope of the city's redevelopment plan to just that road. The trial court held the plan was limited to just the fire access road as a matter of law, but the appellate court reversed because a redevelopment plan "cannot always outline in detail each project that a redevelopment agency will undertake . . . ." (177 Cal.App.3d at p. 841.)

*Watsonville* is inapposite here because there is a difference between the level of detail required of redevelopment plans generally and the particular findings of identifiable replacement housing explicitly required by subdivision (d)(8) of section 33367, as well as implicitly required by subdivisions (d)(7) and (e). A plan need not specify every *project*, but there must be something to identify replacement *housing*.

---

[18]At oral argument before the trial court, the city asserted identification of replacement housing would constitute an "impossible" burden. There are three quick answers to this point.
 One, it was not raised in this appeal.
 Two, given the trauma that redevelopment can visit on poor and moderate income people, the Legislature was hardly unreasonable to require identification of equivalent replacement housing, and therefore the city's avenue for relief is with the Legislature and not the courts.
 Three, it is not necessarily an impossible burden—the land, after all, is available in the project area itself, and the city has the power to require developers to provide such housing—though it may make a project more expensive. (Cf. *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] [precondemnation publicity may lead to inverse condemnation damages].)
 At oral argument before this court the city reiterated its position that it is "enough" simply to promise adequate replacement housing rather than actually identify it.

Two cases have touched on the relocation requirements of section 33367, *Card* v. *Community Redevelopment Agency* (1976) 61 Cal.App.3d 570 [131 Cal.Rptr. 153], and *Sanguinetti* v. *City Council* (1965) 231 Cal.App.2d 813 [42 Cal.Rptr. 268]. Both are consistent with our analysis. *Card* involved a challenge to certain amendments to a redevelopment plan covering a hilly, upper-income section of South Pasadena. The amendments extended the boundaries of the plan to a flat, lower-income area adjacent to, but separate from, the hilly section. By amending an existing plan rather than adopting a new plan, the city council and redevelopment agency had omitted various requirements, including those of section 33367. The appellate court held that in failing to make the findings necessary under section 33367, subdivisions (d)(8) and (e), the city council and redevelopment agency had deprived the citizens of the lower-income area of the "specific assurances of adequate temporary and permanent replacement housing" required by the statute, in effect depriving them of the legal protection they would have had if a new plan had been proposed. (See 61 Cal.App.3d at pp. 580-582.) The court also indicated the residents of the low income area would have had a right to "specifics on relocation" had a new plan been proposed rather than an old plan amended. (See 61 Cal.App.3d at p. 580.)

The use of the word "specifics" suggests something more than a mere promise to find replacement housing when the time comes. The city does not mention *Card* in its brief.

*Sanguinetti* involved an urban renewal project for the skid row section of Stockton. While the court upheld the relocation plan against a general challenge of illegality,[19] the redevelopment agency had specifically identified a large number of dwellings to accommodate the displaced residents. These included 60 hotels (with an average of 777 unoccupied beds), 105 apartments renting for $45 a month or less, 90 apartment units in the $50 to $60 a month range, *and* two labor camps at the south edge of the city. (231 Cal.App.2d at pp. 819-823, fn. 2.)[20] Thus, the court could declare that "Attention [had] been *specifically paid* and provision made for obtaining sites, not only comparable to the dwellings being vacated but within the

---

[19]The appellants in *Sanguinetti* attacked the plan as " 'legally and morally defective,' " but the precise nature of their challenge is not disclosed. (See 231 Cal.App.2d at p. 822.)

[20]The displaced residents in *Sanguinetti* consisted of two groups. One group was made up of 47 families; the other involved some 770 single men who were "permanent" residents of the area plus another 675 transients who would remain during the period of property acquisition. (See 231 Cal.App.2d at p. 821, fn. 2.) The single men and the transients drew most of the court's attention, as no one expected any "difficulty" in relocating the families, as surveys showed "housing was easily obtained" within their "pay capacities." (231 Cal.App.2d at pp. 821-822, fn. 2.)

financial reach of the displacees and at prices comparable to those they [had] been subject to." (231 Cal.App.2d at p. 823, italics added.)[21]

By contrast, here the most the city can point to is a 3.93 percent vacancy rate as of January 1, 1987 (which translates into 2809 units), and a "potential increase of 305 units within the project area." Yet neither a gross vacancy rate nor the bare "potentiality" of new units in a project area—unlike the hotels and apartments actually identified in *Sanguinetti*—can tell anyone anything about the general desirability and cost of *specific* units. Such information is the essence of the protection afforded by subdivision (d)(8) of section 33367.

## IV. CONCLUSION

The judgment was correct in determining the project area to be "blighted" within the meaning of the redevelopment law.[22] However, much of the balance of the judgment was incorrect insofar as it decreed that the redevelopment plan was "lawful and valid and without qualification."[23] As explained above, the redevelopment plan cannot be decreed to be "lawful" insofar as it (a) includes nonblighted property which would not otherwise be affected by the widening of Bristol Street, and (b) does not identify the housing that is or is being provided for those whose homes are taken.

For the benefit of the trial court, we must explain what this partial reversal entails. In terms of the judgment already entered, it means that the *substance* of paragraphs 4 (involving the noncontested issue of the appropriateness of tax dollars for the project), 5 (declaring that the finding of blight is supported by substantial evidence), and 6 (enjoining anyone from challenging

---

[21]There is a statement in *Sanguinetti* that a relocation plan "cannot be specific in the sense of acquiring and holding ready for occupancy suitable relocation sites for displacees." (231 Cal.App.2d at p. 822.) We decline to read this statement as a judicial repeal of the requirement, inherent in the language of section 33367, subdivision (d)(8), that replacement housing be specifically identified. There is a difference between *identifying* such housing—so "displacees" can ascertain whether it is truly comparable—and "acquiring and holding [it] ready for occupancy." And, indeed, in *Sanguinetti* specific replacement housing was identified, even if not acquired and held open at the time of identification.

[22]Paragraph 5 of the judgment recited: "That the City Council of the City of Santa Ana did not abuse its discretion in adopting Ordinance No. NS-2039 in that its finding of blight in the Project Area is supported by substantial evidence in the record."

[23]Paragraphs 1, 2 and 3 of the judgment each declare that Ordinance No. NS-2039, the project, the plan, and implementation of the project and plan from the adoption of Ordinance No. NS-2039 are "lawful," "valid," and "without qualification."

Paragraph 4 of the judgment declared that the use of tax dollars for the project was lawful; this determination has not been challenged in this appeal.

The only other substantive paragraph was paragraph 6, which enjoined all persons from instituting any action which might have raised an issue otherwise adjudicated by the judgment.

the plan on any issue which was or could have been adjudicated in this litigation) are affirmed, and the balance of the judgment is reversed. On remand, we direct that a new judgment be entered which incorporates the substance of paragraphs 4, 5 and 6, but also declares: (a) the city and redevelopment agency have not yet shown why nonblighted property which will not be affected by the widening of Bristol Street must be included in the project area; (b) the city and redevelopment agency have not yet identified the dwellings that are or being provided for the displaced residents in accord with section 33367, subdivision (d)(8); and (c) until (a) and (b) are complied with, the plan is not lawful and the ordinance approving the plan is invalid.

Such a judgment, however, need not necessarily end the redevelopment plan, particularly given the relatively narrow reasons for today's reversal. The city and redevelopment agency are not required to start again from "square one." They must, however, show why nonblighted non-Bristol property must be included in the project area and identify the replacement dwellings that are or are being provided the displaced residents before the plan can lawfully go forward.

As to the former, the city will need to actually show why specific areas away from Bristol Street are "necessary" to the redevelopment. Specific properties will need to be identified and some reason provided why these particular properties are necessary to effective redevelopment. As to the latter, we would point out that the key to the sufficiency of any future findings inheres within the statute itself: will the people who are going to lose their homes be able to ascertain whether the new housing which will be made available to them is genuinely not "less desirable" and at rents or prices within their means?

The plaintiffs will recover their costs on appeal.

Moore, J., and Wallin, J., concurred.

Petitions for a rehearing were denied February 24, 1993, and respondents' petition for review by the Supreme Court was denied April 22, 1993.